## L. O. SMITH *v.* C. L. TUCKER (two cases).

## (*Nashville.* December Term, 1924.)

1. **VENDOR AND PURCHASER.** Rule of caveat emptor generally applies to sales of land.

   Rule of *caveat emptor* generally applies to sales of land. (*Post,* *pp.* 359-363.)

2. **NEGLIGENCE.** Vendor held not required to disclose dangerous condition of premises.

   Vendor *held* not to owe purchaser duty to disclose to him dangerous condition of premises. (*Post, pp.* 359-363.)

   Cases cited and approved: Hines v. Willcox, 96 Tenn., 148; Stenberg v. Willcox, 96 Tenn., 163, 100 Tenn., 524, 538; Cotton Press & Storage Co. v. Miller, 135 Tenn., 187; Wildman Mfg. Co. v. Davenport Hosiery Mills, 147 Tenn., 551; Meadows v. Hopkins, 19 Tenn., 181; Winnard v. Robbins, 22 Tenn., 614; Knox v. Thomas, 24 Tenn., 573; James v. Patterson's Lessee, 31 Tenn., 310; Blight's Lessee v. Rochester, 7 Wheat., 545; Collier v. Harkness, 26 Ga., 362; Barnard v. Duncan, 38 Mo., 170; Parker v. Moulton, 114 Mass., 99; Gimblin v. Harrison, Sneed, 315; Hines & Stenberg v. Willcox, 96 Tenn., 328; Willcox v. Hines, 100 Tenn., 538.

   Cases cited and distinguished: Blight's Lessee v. Rochester, 7 Wheat., 535; Stenberg v. Willcox, 96 Tenn., 163.

3. **LANDLORD AND TENANT.** Landlord is liable for injuries from defective repairs.

   A landlord is liable for injuries caused by defective condition of premises which he has repaired, whether under contractual obligation to make repairs, or whether he undertook to do so gratuitously. (*Post, pp.* 363-367.)

4. **NEGLIGENCE.** Vendor not liable for injuries from defective mantel in premises declared by contractor to be safe.

---

*On liability of landlord for injuries to tenant from negligence in making repairs, see notes in 65 L. R. A. 855; 34 L. R. A. (N. S.) 806; 48 L. R. A. (N. S.) 921.

Smith v. Tucker.

Vendor, who had agreed to repair premises and had sent contractor to inspect defect in mantel pointed out by purchaser, *held* not liable for injuries resulting from collapse of mantel, although contractor declared it was safe and purchaser relied thereon. (*Post, pp.* 363-367.)

Cases cited and approved: Willcox v. Hines, 100 Tenn., 524; Barman v. Spencer, 49 N. E., 9; Stillwell v. South Louisville Land Co., 58 S. W., 696; Gill & Wife v. Middleton, 105 Mass., 477; Miller v. Fisher, 111 Md., 91; Coggs v. Bernard, Smith's Lead. Cas., 355; Thorne v. Deas, 4 Johns., 96; Balfe v. West, 13 Com. B., 466; Elsee v. Gatward, 5 Term. Rep., 143; Wilson v. Brett, 11 Mees. & W., 113; Benden v. Manning, 2 N. H., 289; Shiells v. Blackburne, 1 H. Bl., 158.

Case cited and distinguished: Gregor v. Cady, 82 Me., 131.

5. **NEGLIGENCE.** Failure of vendor to repair dangerous condition as promised held not to create liability for injuries.

Where vendor promised to make repairs after notice of dangerous and defective condition of mantel, failure to do so *held* not to render him liable for injuries caused by fall of mantel. (*Post, pp.* 368-374.)

Cases cited and approved: Merchants' Cotton Press & Storage Co. v. Miller, 135 Tenn., 187; Cavalier v. Pope, 2 K. B., 757; Ryall v. Kidwell, 3 K. B., 123; Edwards v. N. Y., etc., R. Co., 98 N. Y., 245; Stillwell v. South Louisville Land Co., 58 S. W., 696; Thomas v. Vannuci, 185 Ill. App., 414; Patten v. Bartlett, 111 Me., 409; Flood v. Pabst Brewing Co., 158 Wis., 626; Stenberg v. Willcox, 96 Tenn., 163; Willcox v. Hines, 100 Tenn., 538; Edwards v. N. Y. & Harlem R. R. Co., 98 N. Y., 245; Burdick v. Cheadle, 26 Ohio St., 393; Bamberger v. Citizens' Street Ry. Co., 95 Tenn., 18.

6. **PARENT AND CHILD.** Father not entitled to maintain action for loss of services of child instantly killed.

Father *held* not entitled to separate action for loss of services, where child was instantly killed. (*Post, p.* 374.)

*Headnotes 1. Vendor and Purchaser, 39 Cyc., p. 1278; 2. Negligence, 29 Cyc., p. 474; Vendor & Purchaser, 39 Cyc., p. 1286; 3. Landlord and Tenant, 36 C. J., Sections 882, 901; 4. Negligence, 29 Cyc., p. 477; 5. Negligence, 29 Cyc., p. 477; 6. Parent & Child, 29 Cyc., p. 1641.

Smith v. Tucker.

FROM SHELBY.

Appeal from the Circuit Court of Shelby County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court.—Hon. H. W. Laughlin, Judge.

Fitzhugh, Murrah & Fitzhugh, for plaintiff.

Wilson, Gates & Armstrong, for defendant.

Mr. Thomas H. Malone, Special Judge, delivered the opinion of the Court.

These two suits, heard together in the trial court and in the court of civil appeals, are based on the alleged wrongful killing of the infant son of the plaintiff in error. The first suit is brought by Smith for loss of services, and the second suit in his character as administrator.

The trial judge sustained a motion for peremptory instructions in each case, and the court of civil appeals, in a majority opinion delivered by the late Chief Justice Wilson, affirmed the judgments. Both parties bring the cases here by *certiorari,* the plaintiff in error on the ground that the suits were improperly dismissed, the defendant in error on the ground that the court of civil appeals failed to sustain the defense of contributory negligence.

The questions involved appear to be not only of first impression here, but the diligence of counsel has not furnished the court, nor has the court found, any authority from any jurisdiction in point.

Briefly stated, the insistence of the plaintiff in error is that the doctrine of the "Willcox Cases" (*Hines* v. *Willcox* [1895], 96 Tenn., 148, 33 S. W., 914, 34 L. R. A., 824, 54 Am. St. Rep., 923, and *Stenberg* v. *Willcox* [1895]. 96 Tenn., 163, 33 S. W., 917, 34 L. R. A., 615; same cases, 100 Tenn., 524, 45 S. W., 781, 66 Am. St. Rep., 761, and 100 Tenn., 538, 46 S. W., 297, 41 L. R. A., 278, 66 Am. St. Rep., 770; and *Cotton Press & Storage Co.* v. *Miller* [1916], 135 Tenn., 187, 186 S. W., 87, L. R. A., 1916F, 1139) may and should be extended to the relation of vendor and purchaser.

The petitions of the respective parties (who will be styled as they were in the court below) raise these essential questions:

(a)  Was there a breach of duty on the part of the defendant, Tucker, which makes him liable in damages to the plaintiff, Smith, as administrator, on account of the child's death?

(b)  If liability would otherwise exist, is the plaintiff precluded from recovery by contributory negligence?

(c)  Was the father's suit for loss of services properly dismissed?

First.  As to the suit brought by the father as administrator:

As previously stated, the record in this case presents a novel and perplexing question, on which no direct authority in this State, or from other jurisdictions, has been found, either by counsel or by the court. We must, therefore, undertake to work out the rights of the parties in the light of existing decisions and principles.

(1)  The essential part of the declaration (omitting matters of inducement, etc), is as follows:

"Plaintiff, as administrator of the estate of his infant child, Lee Omus Smith, Jr., deceased, sues the defendant, C. L. Tucker, for $25,000 damages, and for cause of action states that during the latter part of October, 1920, plaintiff's wife, Mrs. L. O. Smith, purchased from the defendant a residence located at 1123 Forrest avenue in the city of Memphis, and plaintiff and his family moved into the premises on or about the 1st day of November, 1920, and that about two weeks thereafter a warranty deed to said place was delivered by the defendant to plaintiff's wife. Plaintiff avers that the said premises were new, having just been constructed by the defendant, and plaintiff avers that they were purchased to be used as their future home.

"Plaintiff further avers that, at the time of the purchase of said premises, defendant agreed that said house was in first-class condition, but agreed that if same were found to require any additional work or repairs, the same would be promptly done. Plaintiff relying upon the assurances and warranties hereinbefore mentioned, moved his family into said newly acquired home, believing at the time that same was in a first-class condition, and that it was in all respects safe and habitable and free from dangerous defects of any kind.

"Plaintiff further avers that after he and his family had lived in the home a short time he noticed that the mantel in the dining room of said home had pulled away to a slight extent from the wall, and plaintiff, believing at the time that this was caused by the heat or the settling of the house, called defendant's attention to same, and defendant thereupon agreed that he would inspect said mantel and have it fixed, and plaintiff avers that

on that same afternoon defendant's agent and representative came out, examined the mantel, and assured plaintiff's wife that there was absolutely no danger in it, and that he would have it fixed promptly.

"Plaintiff avers that this condition of the mantel was called directly to the attention of the defendant, and positive assurances were given him that the defect would be remedied. Plaintiff avers that defendant's attention was first called to the condition of said mantel at least a week or ten days prior to the 28th of November, 1920. Plaintiff avers that on Sunday morning, November 28, 1920, at about ten o'clock plaintiff's intestate, his little boy two and one-half years old, was in the dining room with his mother while the latter was engaged in her household duties, and while the child's mother had her back turned to the mantel, which was quite heavy and composed of brick with a concrete slab on top of it, the said mantel suddenly and without warning of any kind fell from the wall and on plaintiff's intestate, horribly crushing the child's chest and head, which injuries caused its death.

"Plaintiff avers that he and his wife not only did not know, but could not have known by the exercise of reasonable care and caution, the dangerous condition of said mantel, but plaintiff avers that the defendant did have knowledge of its dangerous condition; defendant not only failed to warn plaintiff as to the danger, but on the other hand assured plaintiff that the mantel was safe, and that there was no danger to plaintiff's family.

"Plaintiff avers therefore that defendant was grossly negligent in selling a home which was improperly constructed, and that contained a heavy mantel which was

in a dangerous and defective condition at the time, which fact was known to the defendant and unknown to plaintiff or his family. Plaintiff avers further that defendant was grossly negligent in failing and refusing to repair said mantel and put it in a safe condition after his attention was directed to the defects therein. Plaintiff avers that said mantel was negligently and carelessly constructed in that the so-called mortar or other substance which was supposed to hold the heavy brick mantel to the wall, contained little or no cement but was of some substance which crumbled like dirt, and had no cohesive strength to it whatever.

"Plaintiff further avers that there was nothing to hold said mantel to the wall in the way of bolts or other support. Plaintiff avers that it was the duty of the defendant to see to it that said mantel was properly and securely fastened to the wall, but, failing in this duty, defendant knowingly, carelessly, and negligently permitted said mantel to be constructed of inferior material and to be left in a dangerous and defective condition, and that he sold said home with full knowledge that said mantel was improperly constructed and was dangerous to human life, and plaintiff avers that the defendant allowed said dangerous defect to remain and continue even after his attention was directed to same. Plaintiff avers, therefore, that the several acts of negligence complained of herein directly and proximately caused the injuries and death of plaintiff's intestate."

As will be noted, the declaration presents the following theories of liability:

(a) That defendant was negligent in selling plaintiff a home improperly constructed, in that it contained a

151 Tenn.—23.

heavy mantel in a dangerous and defective condition at the time, which fact was known to defendant, and unknown to plaintiff and his family.

(b)   That defendant failed to warn plaintiff of this danger.

(c)   That defendant, through his agent and representative, examined the mantel and assured plaintiff that the mantel was safe, and that there was no danger to plaintiff's family.

(d) ` That defendant was negligent in failing and refusing to repair said mantel, and put it in safe condition after his attention was directed thereto; defendant having agreed and warranted at the time of the purchase that the house was in first-class condition, but that if same should be found to require additional work or repairs, the same would be promptly furnished by the defendant.

To this declaration the defendant pleaded not guilty, and contributory negligence.

(2)   Viewed in the most favorable light for the plaintiff (*Wildman Mfg. Co.* v. *Davenport Hosiery Mills* [1922], 147 Tenn., 551, 556, 557, 249 S. W., 984), the evidence may be stated as follows:

The defendant, Tucker, had built, through E. B. Scott, a contractor of Memphis, Tenn., four bungalows on Forrest avenue in that city.

Under date of October 25, 1920, plaintiff entered into a written contract of sale for one of these houses. The contract provided that conveyance should be made "to L. O. Smith or any person he may name."

Thereafter, Smith directed that deed be made to his wife, which was accordingly done. It bore date October 5, 1920, and was recorded October 28, 1920.

Plaintiff and his family moved into the house about November 1, 1920.

The written contract of sale, above mentioned, was made in the presence of the defendant, Tucker, and at the time of making this contract, and as an inducement thereto, a parol contemporaneous agreement was made between defendant Tucker and plaintiff Smith, by the terms of which Tucker undertook to complete any minor details about the house which were not then completed, and to remedy any condition which was not satisfactory and which was called to his attention.

The written contract of sale calls for a grate basket in the dining room, and the installment of electric fixtures. But the parol contemporaneous agreement contemplated the repairing of anything about the house which, within a reasonable time, proved unsatisfactory, and was called to the attention of the defendant.

Nothing was said about the mantel in this connection.

About November 22, 1920, after plaintiff, Smith, and his family (a wife and two small children) had been occupying the house for approximately three weeks, Mrs. Smith noticed a crack at the intersection of the wall with the brick mantel in one of the rooms.

This mantel was constructed of brick, one brick deep, and on the top was a very heavy concrete slab running the length of the mantel. This concrete slab was estimated to be about six feet in length, eighteen inches in width, and four inches in thickness.

At the time that this crack was first noticed by Mrs. Smith, it was a very small crack, extending only a short distance down the side of the wall.

She immediately called the attention of Mr. Smith to this defect, and he in turn called the attention of Mr.

Moody (defendant, Tucker's, agent) to the same, on Monday November 22d.

At the time of making the parol contemporaneous agreement to repair minor defects, defendant, Tucker, had told Mr. and Mrs. Smith that if anything unsatisfactory developed they might call the attention of Mr. Moody (Tucker's agent) to any such condition, and he would attend to it.

Mr. Moody, who was a contractor and builder, after being told of the condition of the mantel, came on the following day to the house, examined the mantel thoroughly, and told Mrs. Smith that she need not worry over its condition. He caught hold of the mantel and shook it, and when Mrs. Smith called out, "Oh! Mr. Moody don't shake it like that," Mr. Moody said:

"I could shake it with all my weight, and it would stand for years. I just wanted to show you how it was."

He further said:

"It is all right; it is firm; it is perfectly all right; don't worry about it."

The above is the testimony of Mrs Smith.

According to the testimony of Mr. and Mrs. Smith, the above incident occurred on Tuesday afternoon. According to the testimony of Mr. Moody, it occurred on Wednesday.

On Wednesday morning (November 24th) plaintiff Smith met the defendant Tucker, near Tucker's office, which was the same office occupied by the agent, Moody. Plaintiff informed defendant, Tucker, of the condition of the mantel, and reminded him of his agreement to repair, etc. Thereupon defendant Tucker said he would have the matter attended to at once, and according to

his own statement, went across the street and told his agent, Moody, to give it attention.

In her interview with Mr. Moody, Mrs. Smith informed him that she had rented certain rooms in the house, and expected her lodgers to come in "the last of the week," stating that "they might come in on Wednesday or Thursday or might come Saturday." Mr. Moody replied that the work "would be over with" before they came in.

Mrs. Smith relied upon the assurance of safety by one whom she knew to be a contractor, and believed to be competent in such matters, and matters went on in the usual way until Sunday morning, November 28, 1920. At that time no repairs had been made to the mantel, and nothing had been done to it since the examination made by Moody.

The uncontradicted evidence further shows that Moody, on leaving the Smith residence, went directly to another building where a negro mason was engaged in building some brick columns, and engaged him to tear down the mantel and rebuild it. This mason had done work for Moody before, and he knew him to be careful and competent. The mason promised to go to the Smith residence and do this work immediately on finishing the three columns on which he was working. He did, in fact, go to the Smith residence on Monday, the day after the accident.

At that time, labor of this kind was rather scarce and hard to get. There was "more work under construction than there was labor to attend to it."

On Sunday morning Mrs. Smith was engaged in sweeping the house, and had her back turned to her little son

about two and one-half years old. The child was play-
ing in the room in which the mantel was located. As Mrs.
Smith turned around, she saw him climbing up on a
chair before the mantel and apparently reaching toward
the mantel as if to pick up some object. The father's
picture was on the mantel.

At that instant the mantel fell away with a crash, the
brick and heavy stone falling on the little boy, and in-
stantly killing him. Mrs. Smith, who rushed forward,
was too late to avert the accident, and the mantel fell
on her foot, imprisoning her with the child in the debris.

A few days thereafter, this mantel was taken down
and rebuilt, and so were the mantels in the three other
bungalows built at the same time by the defendant,
Tucker.

There seems to be no doubt as to the negligent and im-
proper construction of the mantel. The heavy slab was
resting on brick, which were in no way fastened to the
wall. In addition to this, the mortar was of very poor
quality, and crumbled like dirt or sand, as a number of
the witnesses testified. It should have been tied to the
wall with spikes, or in some other fashion. As construct-
ed the mere settling of the house and floors and drying
out of the timbers and mortar would cause the mantel
to break loose from the wall. An expert builder tes-
tifies that under these circumstances with that heavy
stone on top "the least little thing would make it fall
away."

The evidence, viewed in the most favorable light to
plaintiff, does not show actual knowledge of these con-
ditions on the part of defendant, Tucker, and no such
claim is advanced in the brief and argument of able

counsel for plaintiff in error. Tucker constructed these houses through a contractor, Scott, and Scott in turn had the mantels built by a subcontractor. This subcontractor had left Memphis at the time the suit was tried.

(3) It is evident, from what has just been said, that the plaintiff has failed to make out a case on the theory that defendant, Tucker, sold him the house with actual knowledge of its dangerous condition. There is no evidence to support this theory, and no recovery could have been sustained thereunder even if we should concede it to be sound in law.

(4) It is next contended that the vendor owed the vendee the duty to disclose to him the dangerous condition of the premises and warn him against such condition.

The contention advanced in the declaration in this behalf could only be supported on the theory that the same rule obtains between vendor and purchaser which has, in the "Willcox Cases," been applied to the relation of landlord and tenant. No authority from this or any other jurisdiction has been produced to support this contention.

It may be true that the relation of vendor and purchaser is in some respects similar to the relation of landlord and tenant—especially in the application of the rule of estoppel to deny title, where the vendee is let into possession under contract to purchase. 27 R. C. L., 540, 543; *Meadows* v. *Hopkins* (1838), Meigs, 181, 185, 33 Am. Dec., 140; *Winnard* v. *Robbins* (1842), 3 Humph., 614, 615; *Knox* v. *Thomas* (1845), 5 Humph., 573, 574; *James* v. *Patterson's Lessee* (1851), 1 Swan, 310, 311, 55 Am. Dec., 737.

But we think the two relations are essentially different. *Blight's Lessee* v. *Rochester* (1822), 7 Wheat., 545, 547, 548, 5 L. Ed., 516.

The rule of *caveat emptor* generally applies to sales of land. 27 R. C. L., 356; *Collier* v. *Harkness* (1858), 26 Ga., 362, 71 Am. Dec., 216, 217, 218; *Barnard* v. *Duncan* (1866), 38 Mo., 170, 90 Am. Dec., 416, 424; *Parker* v. *Moulton* (1873), 114 Mass., 99, 19 Am. Rep., 315, 316; *Gimblin* v. *Harrison* (Ky., 1804), Sneed, 315, 2 Am. Dec., 720, 721.

But the rule in this State has been greatly relaxed (if not abolished) as between landlord and tenant. *Hines & Stenberg* v. *Willcox*, 96 Tenn., 328, 333, 34 S. W., 420; *Willcox* v. *Lucy S. Hines*, 100 Tenn., 538, 549, 550, 46 S. W., 297, 41 L. R. A., 278, 66 Am. St. Rep., 770.

The relation of landlord and tenant had its origin in the days of feudal tenures, when the connection was necessarily close and intimate. 16 R. C. L., 650; *Blight's Lessee* v. *Rochester* (1822), 7 Wheat., 535, 547, 548, 5 L. Ed., 516.

In that case, the United States supreme court, speaking through Chief Justice MARSHALL, draws a clear distinction between the relations of vendor and purchaser and landlord and tenant, in so far as concerns the rule of estoppel to repudiate title, in the following language:

"This principle originates in the relation between lessor and lessee, and so far as respects them is well established, and ought to be maintained. The title of the lessee is, in fact, the title of the lessor. He comes in by virtue of it, holds by virtue of it, and rests upon to maintain and justify his possession. He professes to have no independent right in himself, and it is a part

of the very essence of the contract under which he claims that the paramount ownership of the lessor shall be acknowledged during the continuance of the lease, and that possession shall be surrendered at its expiration. He cannot be allowed to controvert the title of the lessor without disparaging his own, and he cannot set up the title of another without violating that contract by which he obtained and holds possession; and breaking that faith which he has pledged, and the obligation of which is still continuing, and in full operation.

"In considering this subject we ought to recollect, too, the policy of the times in which this doctrine originated. It may be traced back to the feudal tenures, when the connection between landlord and tenant was much more intimate than it is at present. When the latter was bound to the former by ties not much less strict, nor not much less sacred, than those of allegiance itself.

"The propriety of applying the doctrines between lessor and lessee to a vendor and vendee, may well be doubted.

"The vendee acquires the property for himself, and his faith is not pledged to maintain the title of the vendor. The rights of the vendor are intended to be extinguished by the sale, and he has no continuing interest in the maintenance of his title, unless he should be called upon in consequence of some covenant or warranty in his deed. The property having become by the sale the property of the vendee, he has a right to fortify that title by the purchase of any other which may protect him in the quiet enjoyment of the premises. No principle of morality restrains him from doing this; nor is either the letter or spirit of the contract violated by it. The only

controversy which ought to arise between him and the vendor respects the payment of the purchase-money. How far he may be bound to this by law, or by the obligations of good faith, is a question depending on all the circumstances of the case, and, in deciding it, all those circumstances are examinable.''

Whatever may be the reason, no case can be found in the books where the vendor has been held liable in damages to the vendee, or to third persons, for personal injuries arising from defects in the premises.

Whether this be on grounds of public policy, or because the rule of *caveat emptor* governs, and no warranty will be implied (Williston on Contracts, vol. 2, section 926), or whether it be because the precedent negotiations are supplanted by the deed when the vendee receives it (27 R. C. L., 529), or whether the reason is to be found in the fact that the delivery of the deed practically terminates the relation of vendor and purchaser, whereas the relation of landlord and tenant is a continuing one, or whether such damages are not supposed to be within the reasonable contemplation of the parties —whatever be the reason, the fact remains.

In Tennessee, under the ''Willcox Cases,'' the relation of landlord and tenant may almost be said to be confidential in its nature.

Thus in *Stenberg* v. *Willcox* (1895), 96 Tenn., 163, 168, 33 S. W., 917, 918, 34 L. R. A., 615, this court said:

''It is the duty of the landlord, when he leases the property, to disclose to the tenant the true condition of the same, and to point out and make known to the tenant such defects as he knows to exist in the premises, or which he could know by reasonable diligence, and if he

fails to do so, and the tenant, or person relying upon his representations, is injured, the landlord is responsible therefor.''

Assuming that this quotation accurately states the law and the duty resting on the landlord, assuredly no such duty was ever imposed on a vendor by any court.

We are therefore of opinion that this theory cannot be sustained.

(5) Another ground of liability asserted in the declaration and supported by evidence is that plaintiff and his wife had a right to rely, and did rely on the fact that a person whom they supposed to be a competent builder had been sent to inspect the mantel, and did inspect it, and after such inspection assured plaintiff's wife that the mantel was safe, and that plaintiff and his wife relied upon this assurance, as they had a right to do.

Here again, plaintiff's claim must rest on the ''Willcox Cases.''

In *Willcox* v. *Lillie Hines* (1897), 100 Tenn., 524, 45 S. W., 781, 66 Am. St. Rep., 761 (a suit by the tenant's daughter, growing out of the same accident), one of the grounds on which liability was predicated was that the landlord sent out a workman to repair the defective porch (which afterwards fell), and this workman actually undertook to repair it, and remarked after he had finished his work:

''Now that is safe.''

But in fact he neither made the porch safe, nor discovered its dangerous condition, which would have been apparent to a workman of ordinary skill. 100 Tenn., 527, 530, 531, 532, 45 S. W., 781, 66 Am. St. Rep., 761.

The trial judge charged, in substance, that if the land-lord agreed to repair the porch, and put it in a safe condition, and sent a workman for that purpose who "failed to put it in a safe condition, but left it unsafe, and in consequence thereof plaintiff was injured, she was entitled to recover." Page 531 (45 S. W., 782).

The only question discussed was whether there was evidence on which to base this portion of the charge.

The legal principle, however, appears to be well-settled—whether the landlord was under contractual obligation to make the repairs, as in *Barman* v. *Spencer* (1898), 151 Ind. 626, 49 N. E., 9, 44 L. R. A., 814 and *Stillwell* v. *South Louisville Land Co.* (1900), 58 S. W., 696, 22 Ky. Law Rep., 785, 52 L. R. A., 325; or whether he gratuitously undertook to do so as in *Gill and Wife* v. *Middleton* (1870), 105 Mass., 477, 7 Am. Rep., 548; *Gregor* v. *Cady* (1889), 82 Me., 131, 19 A., 108, 17 Am. St. Rep., 466; *Miller* v. *Fisher* (1909), 111 Md., 91, 73 A., 891, 50 L. R. A. (N. S.), 295, 300.

In *Barman* v. *Spencer,* supra, a visitor was allowed to recover from the landlord, and in both *Gill* v. *Middleton* and *Gregor* v. *Cady,* the wife of the tenant was allowed damages.

The supreme court of Maine, in *Gregor* v. *Cady,* supra, rests the case of a gratuitous undertaking to repair on the distinction between nonfeasance and misfeasance saying (82 Me., 136, 19 A., 108, 17 Am. St. Rep., at page 469):

"But while it is generally true, with respect to gratuitous contracts, that for nonfeasance no action lies, still, for misfeasance an action on the case may be maintained, inasmuch as 'the confidence induced by undertaking any service for another is a sufficient legal con-

sideration to create a duty in the performance of it.'
Smith's note in *Coggs* v. *Bernard*, Smith's Lead. Cas.
(6th Am. Ed.), 355: 'A distinction exists between non-
feasance and misfeasance—between a total omission to
do an act which one gratuitously promises to do, and a
culpable negligence in the execution of it. . . . If
a party makes a gratuitous engagement, and actually
enters upon the execution of the business, and does it
amiss, through the want of due care, by which damage
ensues to the other party, an action will lie for this mis-
feasance.' 2 Kent's Com., 570; *Thorne* v. *Deas*, 4 Johns.,
96-99; *Balfe* v. *West*, 13 Com. B., 466; 76 Eng. Com. L.;
*Elsee* v. *Gatward*, 5 Term Rep., 143, 149, 150; *Wilson* v.
*Brett*, 11 Mees. & W., 113, 115; 16 Am. Jur., 261 *et seq.*"

In *Gill and Wife* v. *Middleton*, supra, the same dis-
tinction is made, the supreme judicial court of Massa-
chusetts saying (105 Mass., 478, 7 Am. Rep., 549):

"But, although a gratuitous executory contract of that
kind would not be binding upon him, he would place
himself in a very different position if he should see fit
to treat it as binding, and actually enter upon its fulfill-
ment. He is at liberty to repudiate or to perform it, at
his option; but, if his choice should be to perform it, he
comes under some degree of liability as to the manner
of its performance. It is well settled, that, for an in-
jury occasioned by want of due care and skill, in do-
ing what one has promised to do, an action may be main-
tained against him in favor of the party relying on such
promise and injured by the breach of it, although there
was no consideration for the promise. *Benden* v. *Mann-
ing*, 2 N. H., 289; *Thorne* v. *Deas*, 4 Johns., 84; *Elsee* v.

*Gatward,* 5 T. R., 143; *Shiells* v. *Blackburne,* 1 H. Bl., 158; *Balfe* v. *West,* 22 Eng. Law & Eq., 506.

"In this case, the landlord was told that the building was in an unsafe condition; and what he undertook to do, at the request of his tenant, was to make it safe. He not only assumed to do the work, but he notified the tenant when it was done, and invited him to make use of the building, assuring him that it was perfectly safe. Under these circumstances, it was correctly ruled by the presiding judge, that if on trial it proved to be unsafe, by reason of the want of ordinary care and skill on the part of the defendant in the workmanship or in the selection of the materials used, he might be held responsible in damages.

"It is argued that, upon a gratuitious undertaking of this nature, the defendant could only be held responsible for bad faith or for gross negligence, and that it was, therefore, an error to instruct the jury that he was liable for want of ordinary care and skill. But, in assuming to make the repairs at the request of the tenant, he must be considered as professing to have the requisite skill as a mechanic, and as undertaking to select and furnish the kind and quality of materials appropriate to the accomplishment of the desired object. It appears to us that this is one of the cases in which there is no practical difference between gross negligence and the want of ordinary care and skill; and that the omission of what Baron Rolfe calls a mere vituperative epithet is not a valid objection to the judge's charge."

In *Barman* v. *Spencer,* supra, the supreme court of Indiana apparently took a broader ground, saying (44 N. E., 14, 44 L. R. A., 820):

"Our holding that liability exists ·is not on the ground that the landlord contracted to repair since that contract but excused the landlord for going upon the premises. His liability is for an affirmative wrong in creating a dangerous condition. The same liability would have arisen if he had been a stranger to the parties and to the premises."

We need not, however, concern ourselves as to the true basis of this doctrine, for here again we find that the principle is confined to the case of landlord and tenant, and has never been extended to the relationship of vendor and vendee.

Moreover, in all these cases the plaintiffs were not allowed recoveries on the mere assurances of the workmen. They are not merely cases like the instant case, where the workman inspected the premises, and expressed his opinion as to their safety. In these cases, the landlord is held because the workmen actually undertook to make repairs.

In *Willcox* v. *Lillie Hines*, supra, and in *Gill* v. *Middleton*, supra, the workmen undertook to make and did make repairs, and also assured the tenant that the premises were now safe.

In *Barman* v. *Spencer*, supra, the workman who had been sent to repair a cistern took off the platform which covered it, and left it open and unguarded.

It might perhaps have been insisted by plaintiff, in line with the case last cited, that Moody, the defendant's agent, rendered the mantel more unsafe by taking hold of it and shaking it. But we need not speculate as to this, for the declaration does not state nor remotely suggest such a theory.

(6)   The point on which counsel for plaintiff chiefly rely, and which is ably and earnestly pressed in their brief and argument is, that by reason of the negligent failure of defendant to keep his promise to make repairs, after notice of a dangerous and defective condition, the plaintiff's child was killed.

As stated in the printed brief:

"The case is not one of novel impression, because there is nothing in any of the landlord and tenant cases which would lead one to believe that liability existed because there was merely the relation of landlord and tenant.

"On the other hand the principle announced on page 195 of the opinion in *Cotton Press & Storage Company* v. *Miller* clearly shows that the liability is based upon a *negligent failure of the defendant to perform a duty voluntarily assumed by him, which he must have known would protect the occupants of the premises from injury if his agreement be performed, but the nonperformance of it would expose them to danger of personal injury, and the failure to discharge a duty thus voluntarily assumed constitutes actionable negligence under the principles laid down by these cases.*"

The contention is thus grounded on the case of *Merchants' Cotton Press & Storage Co.* v. *Miller* (1916), 135 Tenn., 187, 186 S. W., 87, L. R. A., 1916F, 1139.

In that case, Miller was a servant of the tenant or lessee. After he had been in the lessee company's employment for only three days, he was injured by the falling of a heavy door which was in a dangerous and defective condition.

He brought suit against both the lessor company and the lessee company (his employer), and recovered judg-

ment. The landlord (or lessor company) brought the case to this court by *certiorari,* where the judgment in favor of the employee was affirmed.

In plaintiff's declaration he averred that a door of the building and its attachments and fastenings were old, worn, defective and unsafe; "that this was true at the time the premises were demised by the lessor company to the lessee company, of which facts the lessor had knowledge, but that it negligently failed to properly repair same," etc. By the terms of the lease, the lessor was required to make repairs. It had been advised as early as September, 1913, that the door was unsafe, and it was requested to repair the same in accordance with the terms of its contract. No repairs, however, were made, and in November, 1913, the plaintiff, Miller, received the injuries for which he brought suit.

Recognizing that there was a sharp conflict among the authorities as to the liability of a landlord, who has obligated himself by contract with defendant to make repairs, to a third person lawfully on the premises injured by reason of failure to perform the agreement, this court refused to follow the English rule which makes the test of the lessor's liability privity of contract. See, for example, *Cavalier* v. *Pope* [1905], 2 K. B., 757; Id., [1906], A. C., 428, 5 Ann. Cas., 713; *Ryall* v. *Kidwell,* [1913], 3 K. B., 123, Ann. Cas., 1915B, 163.

In the first of these cases it was held that there was no liability to the wife of the tenant, and in the second, that there was no liability to the tenant's daughter. As stated in the latter opinion:

"A person who is not the tenant has no right of action either in contract or in tort."

151 Tenn.—24.

Refusing to follow this theory, it is said at pages 194, 195:

"A different theory is enforced by other courts—one that does not need the aid of fictional differentiation in order to the working out of just results. We believe these courts announce the better, and what will develop into the prevailing, doctrine when and as applied to members of the tenant's family or to those in his employ in the use of the premises; in short, to those third persons who form the group of persons who, in the fair contemplation of the contracting parties, are customarily to make that use of the premises for which they are let.

"The action of the injured employee, for example, in such cases is not deemed to be on the contract, for the employe is of course a stranger to the lessor's obligation to repair or keep repaired. The remedy is considered to be one for the wrong committed by the lessor in his negligent failure to perform a duty voluntarily assumed by him which he must be held to know would protect the employee of the tenant, as such user of the demised premises, from injury if his engagement be kept, or expose the servant to injury otherwise. Instead of the duty being law-imposed, it is self-imposed. The fact that the duty is voluntarily taken on should not detract from its scope and effect, or lessen the implication which the law will make. Such a duty on nonobservance may constitute the culpable negligence that is the basis for an action sounding in tort. The implication of legal duty and the *delictum* arise in this way out of the obligation incorporated in the contract, not on the contract. *Edwards* v. *New York, etc., R. Co.*, 98 N. Y., 245,

50 Am. Rep., 659; *Stillwell* v. *South Louisville Land Co.* (Ky.), 58 S. W., 696, 52 L. R. A., 325; *Thomas* v. *Vannuci,* 185 Ill. App., 414; *Patten* v. *Bartlett,* 111 Me., 409, 89 Atl., 375, 49 L. R. A. (N. S.), 1120; *Flood* v. *Pabst Brewing Co.,* 158 Wis., 626, 635, 149 N. W., 489. And see *Stenberg* v. *Willcox,* 96 Tenn., 163, 33 S. W., 917, 34 L. R. A., 615.''

The basis of this decision is apparently to be found in the suggestion advanced in the ''Willcox Cases'' that the liability is predicated ''upon the *delictum* of the landlord, and not on contract.'' *Willcox* v. *Lucy S. Hines,* 100 Tenn., 538, 544, 46 S. W., 297, 41 L. R. A., 278, 66 Am. St. Rep., 770, approving *Edwards* v. *N. Y. & Harlem R. R. Co.* (1885), 98 N. Y., 245, 50 Am. Rep., 659.

See, also, Id., pp. 548, 549.

So, in *Stenberg* v. *Willcox,* 96 Tenn., 163, 33 S. W., 917, 34 L. R. A., 615, wherein a boarder was allowed damages, this court says at page 164, 33 S. W., 917, that the right to recover cannot be based ''upon any contract between the defendant and Mrs. Hines of which Mrs. Stenberg may have known nothing, and to which she was not a party.''

See, also, *Hines* v. *Willcox,* and *Stenberg* v. *Willcox* (on petition to rehear), 96 Tenn., 328, 330, 336, 34 S. W., 420; and *Willcox* v. *Lillie Hines* (the tenant's daughter), 100 Tenn., 524, 528, 45 S. W., 781, 782, 66 Am. St. Rep., 761, where it is said:

''In respect of the first count of the declaration, which alleges a contract to repair made by the agent of Willcox with M. P. Hines and wife, it suffices to say that Miss Lillie Hines was not a party to that contract''—citing

*Burdick.*v. *Cheadle* (1875), 26 Ohio St., 393, 20 Am. Rep., 767.

The landlord's liability, then, as to third persons (including a child of the tenant) cannot rest on the terms of the contract to repair. It must rest on tort—on the *"delictum"* of the landlord in failing to carry out a self-imposed obligation.

But it seems apparent that this principle, however broadly stated, must have its limitations.

Would it be extended to strangers?

Suppose that some charitable individual should meet a needy acquaintance, and being advised of the dangerous condition of the latter's house, should voluntarily promise to have the necessary repairs made; and suppose the owner of the premises should rely on this promise, which was never fulfilled, and thereafter a member of his family should be injured or killed by reason of the defects—would the promisor be liable? Plainly not, for in the case supposed there would be no binding obligation.

But let us go a step further. Suppose A. is a carpenter, and B. is a doctor, and that B. contracts to give medical attention to A.'s family for a year, in consideration of A.'s agreement to keep B.'s house in repair for a year, and suppose that, after notice of a defect, A. neglects to repair the house, and a member of B.'s family is thereby killed; would A. be liable?

Here we would have the case of a "self-imposed" binding obligation to repair; but could there be any liability either in contract or in tort? We think not.

What, then, is the difference between this supposed case and the case of *Cotton Press & Storage Co.* v. *Miller?*

Simply this: That the Miller Case, and the Willcox Cases, and the authorities on which they in turn rest, impose liability on account of the peculiar and *quasi-* confidential relation of landlord and tenant.

More seems to be expected of a landlord, as regards the tenant's family, than is expected of another, though both make the same contract to repair.

The "Willcox Cases" are frankly based on an exception to the general rule of *caveat emptor* (96 Tenn., 333, 34 S. W., 420, 100 Tenn., 549, 46 S. W., 297, 41 L. R. A., 278, 66 Am. St. Rep., 770), and this exception as it seems to us, can only be justified by reason of the relation of the parties. It will not do, we think, to pass over the relation actually involved, and seek to predicate liability on some theoretical maxim which (it is assumed) applies to other relations. See *Willcox* v. *Lucy S. Hines,* 100 Tenn., 538, 549, 46 S. W., 297, 41 L. R. A., 278, 66 Am. St. Rep., 770.

If such a principle exists—if, as is now insisted by able counsel, it applies, under all circumstances—why is it that all the authorities cited in the "Willcox Cases" (and in the Miller Case), are exclusively landlord and tenant cases?

It is proper to note, in this connection, that the Miller Case does not purport to deal with any other relation than that of landlord and tenant, and recognizes (135 Tenn., 190, 192, 186 S. W., 87, L. R. A., 1916F, 1137), that the weight of authority is probably against liability, even where the parties occupy that relation.

The liability imposed in these cases has never yet, so far as we are aware, been extended to any other relation. We have followed the doctrine to its extreme boundary

in the case of landlord and tenant. `But we must de-.
cline to extend it further.

It results that the lower courts properly sustained the
motion for a directed verdict in the suit brought by the
father as administrator.

Second.  The conclusion which we have reached ren-
ders it unnecessary to discuss the question of imputed
contributory negligence, which might otherwise have re-
quired consideration.  *Bamberger* v. *Citizens' Street
Railway Co.* (1895), 95 Tenn., 18, 31 S. W., 163, 28 L. R.
A., 486, 49 Am. St. Rep., 909.

Third.  The father's case for loss of services was prop-
erly dismissed, on the additional ground that the law in
this State gives the father no separate action for loss of
services, where a child is instantly killed.

While the case presented by this record is an appeal-
ing one, we are unable to see any error in the judgment
of the court of civil appeals, and it must accordingly be
affirmed.