George and Lora STEPANOV, Tom and Rita Gittins, Steinar and Eidum Hansen, Reid and Eunice Dresser, and Turner Construction Co., Inc., Appellants,

v.

Louis GAVRILOVICH, Milanka Gavrilovich, and Hewitt V. Lounsbury and Associates, Appellees.

No. 3236.

Supreme Court of Alaska.

March 30, 1979.

Richard L. Crabtree and LeRoy E. De-Veaux, of Wanamaker & DeVeaux, Anchorage, for appellants.

Suzanne Cherot Pestinger, Birch, Horton, Bittner & Monroe, Anchorage, for appellee Lounsbury & Associates.

Randall E. Farleigh, Robison, McCaskey, Reynolds & Frankel, Anchorage, for Louis Gavrilovich.

OPINION

Before BOOCHEVER, C. J., RABINOW-ITZ, CONNOR and BURKE, JJ., and DI-MOND, Senior Justice.

BURKE, Justice.

This appeal requires us to decide whether a subdivider who has sold land or a contractor who has purchased and built upon it should bear the loss incurred when a house built by the contractor subsides as a result of undetected permafrost melting in the ground. Also at issue are certain procedural rulings and the trial court's award of attorney's fees.

The facts giving rise to this controversy are as follows.[1] In late 1967 or early 1968, Louis and Milanka Gavrilovich (hereinafter Gavrilovich), appellees, purchased approximately forty-four acres of unimproved land in the Anchorage area. With the aid of Hewitt V. Lounsbury & Associates (hereinafter Lounsbury), they subdivided the land to create approximately 150 residential building lots. Lounsbury, which had engaged in engineering and survey work in Alaska since 1949, was responsible for the design and engineering work and had arranged for certain soil tests to be done. The actual testing was performed by Alaska Geological Consultants (hereinafter AGC), a firm retained for that purpose by Lounsbury. AGC was familiar with the testing methods required and had performed hundreds of soil tests in the Anchorage area. The presence of permafrost was not expected in the particular area involved, nor was it revealed by any of the tests performed.

Beginning in 1970, appellants Turner Construction Company (Turner); Steiner R. and Eidum R. Hansen; Reid H. and Eunice M. Dresser, d/b/a Dresser Construction, Inc.; George and Lora Stepanov; and Thomas K. and Rita S. Gittins, all of whom were contractors, purchased various lots in the tract and constructed single-family homes upon them. In 1971, the houses began to subside. Additional soil testing at this later date revealed the presence of scattered "lenses"[2] of permafrost in the lots. Apparently due to heat generated by the houses, the permafrost under them had melted, causing them to settle.

The contractors bought back the houses that they had built and separately filed actions against Gavrilovich and Lounsbury. They alleged several theories of liability including breach of an implied warranty of fitness and strict liability.[3] These actions were later consolidated. Prior to trial, appellants and Gavrilovich filed cross-motions for summary judgment on appellants' claims that Gavrilovich was liable on theories of breach of implied warranty and strict liability. Ralph E. Moody, judge of the superior court, denied Gavrilovich's motion for summary judgment but granted partial summary judgment in favor of appellants establishing Gavrilovich's liability on the ground of strict liability. Gavrilovich's motion for reconsideration of the matter was denied.

Due to illness, Judge Moody was unable to try the case as scheduled and it was reassigned to the Honorable J. Justin Ripley, another judge of the superior court. On the first day of trial, Gavrilovich again moved for reconsideration of Judge Moody's ruling. Judge Ripley granted the motion and reversed Judge Moody's order, thus granting summary judgment in favor of Gavrilovich on appellants' claims based on principles of breach of implied warranty and strict liability. Appellants proceeded to trial on their other theories, but were unsuccessful. Judgment was then entered in favor of Gavrilovich and Lounsbury includ-

---

1. Our recital of the facts is based upon the superior court's written findings of fact. As those findings are not challenged here, we accept them as stated.

2. "Lenses" of permafrost are scattered subsurface areas of frozen or frosty soil, as opposed to widespread sheets of permafrost.

3. Appellants' other theories were negligent representation as to the quality of the land and intentional misrepresentation.

ing an award for costs and attorney's fees. Insofar as they present an issue in this appeal, the attorney's fees awarded were $25,000 to Gavrilovich and $30,000 to Lounsbury. The judgment further provided that appellants' liability for costs and attorney's fees was joint and several. This appeal followed.

This case presents an important issue. As the state develops, there will no doubt be other instances where land thought to be suitable for building turns out to be either unsuitable for that purpose or far more costly to build upon than was estimated because of the presence of permafrost. True, the experience gained during the construction of the Trans-Alaska Pipeline has added greatly to what was previously known, but problems of detecting and building upon permafrost will in all likelihood continue to plague Alaskans for many years to come.[4]

**I**

The main issue confronting us is whether a subdivider, such as Gavrilovich, can be held liable for damages caused by undetected permafrost on either of two theories: (1) breach of an implied warranty of fitness or (2) strict liability. Although it was not applicable to subdivisions within Alaska at the time of the events giving rise to this action, we are persuaded by certain provisions of Alaska's present Land Sales Practices Act, AS 34.55,[5] to hold that such liability does not attach.

■ AS 34.55.008 requires: (a) the registration of subdivided land before it can be sold and (b) delivery of a "public offering statement" to the purchaser before the disposition. According to AS 34.55.012(a), the "public offering statement shall disclose fully and accurately the physical characteristics of the subdivided land offered and

shall make known to prospective purchasers all unusual and material circumstances or features affecting the subdivided land." AS 34.55.030 provides (emphasis added):

(a) A person who disposes of subdivided land in violation of . . . § 8 of this chapter is liable as provided in this section to the purchaser *unless in the case of an untruth or omission it is proved that the purchaser knew of the untruth or omission or that the person offering or disposing of subdivided land did not know and in the exercise of reasonable care could not have known of the untruth or omission.*

(b) In addition to any other remedies, the purchaser, under (a) of this section, may recover the consideration paid for the lot, parcel, unit or interest in subdivided land together with interest at the rate of six per cent a year from the date of payment, property taxes paid, costs, and reasonable attorney fees less the amount of income received from the subdivided land upon tender of appropriate instruments of reconveyance. . . .

We have little difficulty in concluding that the presence of permafrost is an important "physical characteristic" and one of the "material circumstances or features affecting . . . subdivided land." As such, the failure to disclose its existence in the "public offering statement" required by AS 34.55.008 and 34.55.012(a) can result in civil liability under the present statutory scheme. AS 34.55.030. However, such liability does not attach if "the person offering or disposing of subdivided land did not know and in the exercise of reasonable care could not have known of the . . . omission." *Id.*

In the case at bar the superior court's findings of fact included the following:

---

4. The record indicates that although it is possible to build safely on permafrost and that there have been great strides made since the testing was done here, it is still very difficult, if not impossible, to accurately predict the presence of permafrost. Testing methods, although improved, are still both expensive and relatively

uncertain. It is apparent that the solution to these problems will not come easily.

5. The Alaska act is based on the Uniform Land Sales Practices Act prepared by the National Conference of Commissioners on Uniform State Laws.

**34**

### XXV

In performing a soils evaluation of the proposed Castle Heights Subdivision and in preparing the soils report, Alaska Geological Consultants identified all construction hazards which would or could have been reasonably known to or discovered by reputable soils testers in the Anchorage area at the time utilizing the best techniques and equipment which were reasonably available to and understood by well-qualified members of that profession.

### XXVI

Based upon the then available technical information and standard of understanding within the profession, the selection of test drilling sites, depth of drilling, methods of sampling and the interpretation and reporting of the information so obtained by Alaska Geological Consultants, were reasonable and adequate; and complied with the best known and accepted standards for the soil testing industry generally both [sic] within the local Anchorage community, regionally and nationwide. The type of drilling equipment utilized by Alaska Geological Consultants to place the test holes and retrieve samples was as well suited for its intended purpose as any equipment reasonably available to any soil testing firm in the area during April of 1968.

### XXVII

The area now encompassed in the Castle Heights Subdivision which was the subject of the April 1968 subsurface evaluation by Alaska Geological Consultants presented no evidence at the surface either by way of topography, vegetation, drainage pattern, or any other characteristic or phenomenon observable either in the field or by aerial photography which should have alerted or suggested to a reasonably competent and trained engineering geologist or soils engineer or should have suggested to any soils geologist or soils engineer that it would be or might be underlain by permafrost or that

it would or might differ in any substantial regard from other portions of the Anchorage area which had proven to be fully satisfactory for the construction of single and dual family residences.

### XXX

Based on the fact that construction experience in Anchorage, Alaska from as early as the founding of the city in approximately 1915 until the Castle Heights discovery of permafrost in 1973 during which period of time there was not a known instance of structural damage or property damage or loss due to permafrost there was no reasonable or financial justification for increasing the frequency of test holes and test hole depth and passing the resulting costs on to the ultimate consumers beyond the scope of exploration actually applied by Alaska Geological Consultants.

### XXXII

Prior to the discovery of permafrost on Lots 7, 8 and 9, well-qualified and experienced engineers and geologists including those actually employed in doing soil testing had not discovered the existence in the Anchorage area of permafrost the nature of that discovered in Castle Heights. It was widely accepted and believed throughout the profession that the Anchorage Bowl area was free from permafrost of this type. All of the available literature of a technical and professional nature including publications of the U.S. Geological Survey failed to identify permafrost as existing in the Anchorage area and either declared that the Anchorage area was free from permafrost or thought to be generally free of permafrost. U.S. Geological Bulletin 1049 which was then considered within the engineering and geological professions as an authoritative work on the Anchorage area did not mention the existence or even the possibility of permafrost in the Anchorage area and did not mention or suggest

permafrost as one of the then recognized construction or foundation hazards in the Anchorage area. Laymen, including defendants Gavrilovich and plaintiffs, Reid Dresser, Steiner Hansen, Turner Construction Inc. through its president, Rexford Turner, and George Stepanov, all believed the area of the Castle Heights Subdivisions to be free of permafrost at the times the plaintiffs purchased the lots in question from defendants Gavrilovich.

. . . .

### LXV

At no time prior to or concurrent with the sale of the lots to respective plaintiffs by defendants Gavrilovich were defendants Gavrilovich aware of the existence of permafrost or deep frozen material on the lots described herein nor did Defendants Gavrilovich have reason to suspect that such material existed on the lots in question.

### LXVI

At no time prior to the construction of dwellings upon the lots in question by plaintiffs were defendants Gavrilovich aware of the existence of permafrost or deep frozen material on the lots in question nor did they have reason to believe nor a reasonable opportunity to discover that such material existed on the lots in question.

■ These findings, which are not disputed, establish that at the time the lots were offered and sold Gavrilovich "did not know and in the exercise of reasonable care could not have known" of the presence of permafrost. Such being the case, if the sales of those lots were to take place today, under otherwise identical circumstances, Gavrilovich would be exempt from liability under the Land Sales Practices Act. AS 34.55.030.

■ While not directly applicable to the sales that were made in this case,[6] we believe that this act does provide the most appropriate model for the rule of law that we now must devise in order to determine the issue that is before us. Accordingly, we hold that a subdivider, in this case Gavrilovich, cannot be held liable on either of the two theories urged by appellants, namely: strict liability or liability for breach of an implied warranty of fitness for damages incurred by a purchaser of his lots because of the presence of permafrost. Their liability depends, instead, upon the failure to disclose permafrost conditions that are known to them or those that they could have known of through the exercise of reasonable care, i. e., the use of appropriate testing methods, review of available geologic data, etc. Judge Ripley, therefore, ruled correctly on the parties' cross-motions for partial summary judgment.

■ This holding is motivated in part by our belief that its opposite would lead to an illogical and unjust result. In enacting the Uniform Land Sales Practices Act for Alaska, the legislature clearly intended to impose a system of controls on the activities of large-scale subdividers such as Gavrilovich. One of those controls is civil liability when subdividers fail to disclose to a purchaser a physical characteristic of the subdivided land, such as permafrost, which adversely affects the usefulness of the land. But, when the condition is unknown to the subdivider, he is liable only if it is one that he could have learned of through the exercise of reasonable care. We believe that it would be both illogical and unjust for this court to now devise a rule requiring subdividers operating before the statutory controls became effective to be held to a more exacting standard.[7]

---

**6.** At that time the act applied only to sales of lots located outside the state. AS 34.55.044(6) defined a "subdivision" or "subdivided land" as "land located outside this state . . . ." Ch. 179, § 1, SLA 1968. In 1977 that section was amended. The amendment deleted the phrase "located outside this state." Ch. 138, § 8, SLA 1977. Thus, the act was made applicable to sales of lots located within the state, except for certain exempted transactions. *See* AS 34.55.008; AS 34.55.042.

**7.** We also wish to avoid any suggestion that a more stringent standard could be applied to small tract subdividers who are still outside the provisions of the Land Sales Practices Act,

## II

The next issue presented is whether Judge Ripley erred in reconsidering and reversing Judge Moody's earlier ruling. Appellants argue that Judge Ripley ignored the doctrine of "the law of the case" and thereby abused his discretion.

Appellants, in their brief, correctly note that that doctrine is a matter of sound judicial policy, rather than an absolute rule of law, and "specifically grant" that Judge Ripley had the power to do what he did. As Mr. Justice Holmes stated in *Messinger v. Anderson*, 225 U.S. 436, 32 S.Ct. 739, 56 L.Ed. 1152 (1912):

> In the absence of statute the phrase, "law of the case," as applied to the effect of previous orders on the later action of the court rendering them in the same case, merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power.

*Id.* at 444, 32 S.Ct. at 740, 56 L.Ed. at 1156. Thus, the United States Court of Appeals, Ninth Circuit, has held:

> [T]he power of each judge of a multi-judge court is equal and coextensive; it permits one to overrule the order of another under proper circumstances, and where one judge has done so the question becomes one of the proper exercise of judicial discretion.

*Castner v. First National Bank of Anchorage*, 278 F.2d 376, 380 (9th Cir. 1960).

While this power is not to be used lightly, we are satisfied that Judge Ripley properly exercised his discretion in this case. First of all, this was not a case of "forum shopping." It was necessary for Judge Ripley to replace Judge Moody because of the latter's illness. Next, we think it entirely reasonable for a judge whose responsibility it is to try a case to reconsider and reverse an earlier ruling if convinced that that ruling was erroneous. Finally, we believe that in this case Judge Moody's ruling was erroneous.

since AS 34.55.042 exempts from the act's coverage those subdividers offering fewer than 50 lots within the state during a 12 month period. Again, it would seem both illogical and unjust

## III

Appellants' next contention is that, since their complaints were filed separately, they should have been individually liable only for a pro-rata share of taxable costs and attorney's fees, and that the trial court erred in imposing joint and several liability for those items. We do not agree.

In *Karrick v. Edes*, 57 App.D.C. 219, 19 F.2d 693 (1927), where several plaintiffs united in bringing an unsuccessful action, the court held that costs could be taxed against them jointly and severally, noted that the various cases all involved certain questions which affected all complainants alike, and referred to the "familiar law that, where several plaintiffs unite in bringing an action, costs may be taxed against all of them and recovery had against any of them." *Id.* 57 App.D.C. at 222, 19 F.2d at 695. *See also* 20 C.J.S. *Costs* § 111 at 353 (1940), and cases cited therein. We think the same rule applies here.

Appellants moved to consolidate their actions because they concerned the same issue. All brought suit against the same parties, alleging the same cause of action. We think it just and reasonable that they bear the costs incurred in defending against their united claims jointly and severally. The authorities cited by appellants fail to persuade us to the contrary. We note with approval, however, the rule, as expressed in *Karrick*, 57 App.D.C. at 222, 19 F.2d at 695, that "[o]ne judgment debtor, who has paid the costs, may have contribution against the others."

## IV

Appellants' final claim of error involves a two-pronged attack upon the trial court's award of attorney's fees to Gavrilovich and Lounsbury. The court awarded Gavrilovich $25,000. The award to Louns-

to hold such individuals to a higher standard than that applicable to their large-scale competitors.

bury was for $30,000. Appellants claim that the amounts awarded were excessive, and that Rule 82, Alaska R.Civ.P., under which the awards were made, violates the due process and equal protection clauses of the state and federal constitutions, insofar as it allows attorney's fees to be awarded against plaintiffs who litigate good-faith claims.

Appellants' constitutional argument is that if Rule 82 is used to award attorney's fees against good-faith plaintiffs, the risk to such individuals will operate as a "financial gag" that "strikes at the very heart of [the] due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States and to Article 1, Sections 1 and 7 of the Constitution of the State of Alaska." This argument, however, completely ignores the financial burden that such plaintiffs impose upon those who are forced to defend against such actions in equal good-faith.

The authority to make such awards is derived from AS 09.60.010. That section provides:

> *Costs allowed prevailing party.* Except as otherwise provided by statute, the supreme court shall determine by rule or order what costs, if any, including attorney fees, shall be allowed the prevailing party in any case.

As noted in *McDonough v. Lee*, 420 P.2d 459, 460 n.2, 461 (Alaska 1966), that authority is of relatively ancient origin, dating from an Act of Congress of June 6, 1900, 31 Stat. 415–18, which was amended in 1923 by the Territorial Legislature of Alaska to expressly permit the courts to impose reasona-

ble attorney's fees. While we recognize that attorney's fees and costs may well be a burden upon litigants, we cannot agree with appellants that Rule 82, as applied in this case, violates either the state or federal constitutional guarantees of due process and equal protection of the law.

A majority finds the second prong of appellants' attack more persuasive.

In *Malvo v. J. C. Penney Co.*, 512 P.2d 575 (Alaska 1973), we reiterated the belief that "[t]he purpose of Civil Rule 82 in providing for the allowance of attorney's fees is to *partially* compensate a prevailing party . . . ." *Id.* at 587, quoting *Preferred General Agency of Alaska, Inc. v. Raffetto*, 391 P.2d 951, 954 (Alaska 1964). Four of the five justices participating in the decision of the case at bar are convinced that the amounts awarded to Lounsbury and Gavrilovich for attorney's fees, rather than providing partial compensation, provides substantially full attorney's fees, contrary to the philosophy expressed in *Malvo*, and that to the extent the award for attorney's fees exceeds $20,000 it is manifestly unreasonable. Accordingly, the award of attorney's fees is reversed and the case remanded to the superior court for a redetermination of this issue; the total amount to be awarded to appellees for their attorney's fees shall not exceed $20,000.

For the reasons stated in note 8, the author of this opinion dissents on this issue and would hold that the amount awarded for attorney's fees was not manifestly unreasonable.[8]

AFFIRMED in part, REVERSED in part.

8. In *Alaska Placer Co. v. Lee*, 553 P.2d 54 (Alaska 1976), we said: "This court has recognized that the trial judge has wide discretion in awarding attorney's fees to [the] prevailing party. We will interfere only where the trial court's determination as to attorney's fees appears to be 'manifestly unreasonable.'" *Id.* at 63 (footnotes omitted). Appellants correctly cite our decision in *Malvo v. J. C. Penney Co.*, 512 P.2d 575 (Alaska 1973), for the proposition that under Rule 82 a prevailing party is generally entitled to be only partially compensated for his attorney's fees. However, it is important to distinguish between awards intended to

fully compensate litigants and those which only partially compensate them but happen to be for large amounts. The author believes that the award in this case falls into the latter category.

The preparation for trial of the case involved extensive discovery procedures and took in excess of two years. The trial itself lasted three weeks. Appellants claimed that they were entitled to damages totalling approximately .4 million dollars, and the case involved novel and complex questions of law. Under these circumstances, the author is unable to agree that the amount awarded was manifestly unreasonable. Accordingly, he would affirm the award.