James B. LOVELAND and Lynette Loveland, individually and as personal representatives of the Estate of Michael Loveland, Plaintiffs and Appellants,

v.

OREM CITY CORP.; North Union Irrigation Co., a Utah corporation; and Brown Brothers, a partnership, Defendants and Respondents.

No. 19942.

Supreme Court of Utah.

Nov. 23, 1987.

Stephen L. Henriod, Richard K. Hincks, Douglas K. Pehrson, David L. Rasmussen, Salt Lake City, for plaintiffs and appellants.

Allan L. Larson, Salt Lake City, for Orem City Corp.

J. Anthony Eyre, Robert H. Rees, Salt Lake City, for North Union Irr. Co.

Roger H. Bullock, Salt Lake City, for Brown Bros.

HALL, Chief Justice:

Plaintiffs initiated this wrongful death action after Michael Loveland, their three-year-old son, drowned in an irrigation canal. Plaintiffs seek reversal of three district court orders granting defendants' motions for summary judgment. We affirm.

## I

We review the facts of this case in the light most favorable to plaintiffs.[1] Defendant North Union Irrigation Company (North Union) was incorporated in April 1883. At that time, it began operating the North Union Irrigation Ditch (canal) in Utah County, and it continues doing so today.

In July 1976, defendant Brown Brothers became involved in the development of the Executive Estates subdivision in Orem City, Utah. The subdivision is comprised of three plats: plat A, plat B, and plat C. The canal borders portions of all three plats.

The Orem City Planning Commission originally mandated that the Executive Estates plat A subdivision plan provide for the covering of the canal where it crossed that plat to provide the required setback. Brown Brothers subsequently appealed this decision to the Orem City Council, and eventually the Council changed the specification to require fencing of the canal in plat A. Neither the Planning Commission nor the City Council ever expressly required the covering or the fencing of the canal in plats B or C.

Following the development of lot sixteen in plat B of the subdivision, Brown Brothers sold the lot to John Atkinson, dba Jacor, Inc. Jacor in turn constructed a home on the lot and then put the property up for sale.

In October 1978, plaintiffs (Lovelands) were shopping for a house. At that time, they examined the house built by Jacor on lot sixteen. While at the site, the Lovelands noticed North Union's canal that ran through the lot and parallel to the rear lot line. The Lovelands observed that the con-

---

1. *See Weber v. Springville City,* 725 P.2d 1360, 1361 n. 1 (Utah 1986).

crete canal had sloping sides and a flat bottom and was about ten feet wide. At the time the Lovelands inspected the property, there was no water flowing in the canal. When the Lovelands voiced their concern about the canal to Atkinson, he told them not to be concerned because a former real estate listing agent had a document showing that the developers were required by Orem City to fence the canal. Mr. Loveland, himself a building contractor, called the agent, and she confirmed that such a document existed. However, the Lovelands never saw the document, which in actuality only referred to plat A of the subdivision.

Thereafter, Mr. Loveland spoke with a neighboring property owner, Gary Starr, who told Mr. Loveland that fencing the canal was a subdivision plat requirement. Starr also informed Mr. Loveland that although he did not know when the fence would be erected, Orem City had said it would be installed before water was allowed in the canal. The Lovelands subsequently purchased the property from Jacor and moved into their new home in December 1978.

During the winter months, the Lovelands were told by Starr that Orem City was claiming it had no obligation to fence the canal, and an ad hoc neighborhood committee was subsequently formed to deal, in part, with concerns about getting the canal fenced. Starr became the committee's spokesman, and the Lovelands claim he had numerous contacts with North Union between January and May of 1979. The Lovelands also claim North Union indicated that the canal was going to be fenced. The committee prepared a petition for presentation to the Orem City Council. The petition sought improvement of the subdivision's roads and Council assistance to get the canal fenced. However, the City Council was never presented with the petition. The petition was subsequently presented to Orem City's mayor. Thereafter, the roads were improved, but nothing was done about the canal. The Lovelands had no direct contact or personal dealings with the City or any of its officers or representatives.

In April 1979, Mr. Loveland had a conversation with a North Union water master and was told that North Union was trying to work with Orem City to get the fence into place. On May 1, 1979, water began flowing in the canal. The Lovelands claim they were not given advance notice that the canal was to be filled. On May 11, 1979, Mr. Loveland again spoke to the same water master and this time was told that the company was trying to pressure Orem City into installing a fence.

On May 18, 1979, almost three weeks after Mr. Loveland noticed water flowing in the canal, Michael Loveland, while unsupervised, walked out the back door of the Lovelands' home, across the back yard to the cement bank of the canal, and either climbed down or slipped into the water and was drowned. After the incident, the Lovelands requested $200 that was escrowed when they purchased their home for fencing the canal on their lot and, together with their neighbors' financial help, fenced the canal in plats B and C.

Counts one and two of the Lovelands' amended complaint, directed at all three defendants, were grounded on strict liability and negligence theories, respectively. Count three of the complaint, directed only at Orem City and Brown Brothers, was based upon an implied warranty theory. On appeal, the Lovelands only advance the theories found in the first two counts.

## II

### BROWN BROTHERS

The Lovelands' first point is that factual questions concerning Brown Brothers' obligation to fence the canal should have precluded entry of summary judgment in favor of that defendant. This position, however, presupposes the existence of a duty owed by Brown Brothers to Michael Loveland. It is axiomatic that one may not be liable to another in tort absent a duty.[2]

---

2. *See Moreno v. Marrs,* 102 N.M. 373, 376, 695 P.2d 1322, 1325, 1328 (N.M.Ct.App.1984), *cert. quashed sub nom. Corral, Inc. v. Marris,* 102 N.M. 412, 696 P.2d 1005 (N.M.1985).

The question of whether a duty exists is a question of law.[3] As always, resolution of this issue begins with an examination of the legal relationships between the parties, followed by an analysis of the duties created by these relationships.

In this case, three possible duty-creating relationships are at issue. The Lovelands principally depend on their status as foreseeable purchasers from Brown Brothers, which, as a land developer, conducted activities to improve raw acreage into residential building lots. Alternatively, a relationship is said to have arisen out of an agreement between Brown Brothers and Orem City whereby the former was to fence the canal. Finally, the relationship between the Lovelands as subvendees and Brown Brothers as a vendor must be analyzed. It is with this latter relationship that we begin our analysis.

The "somewhat murky" development of the law surrounding predecessor landowners' liability has given rise to at least three schools of thought regarding recovery for postconveyance injuries occurring on private property due to natural or artificial conditions existing thereon when the present owner or possessor assumed control.[4] The California Supreme Court, although in a different context, recently discussed these three views: The older general rule has been that the seller of realty is not subject to liability for bodily injury suffered by third persons after the vendee has taken possession. This rule has held true even though the vendor may have been responsible for creating a dangerous condition on the land which caused the injury. An intermediate position is that espoused in the Restatement (Second) of Torts and in Professor Keaton and Pros-

ser's text on tort law which provides that the predecessor in title may in certain situations be subject to liability for injuries to third persons that arise after he or she relinquishes title. The scope of this exposure will be examined more thoroughly below. Under the third view, the predecessor in title remains subject to liability until the dangerous condition created by him has been corrected.[5]

■ In its defense, Brown Brothers, both here and below, advances that portion of the Restatement (Second) of Torts § 352 (1965) which contains the older general rule. That provision provides, in pertinent part: "[A] vendor of land is not subject to liability for physical harm caused to his vendee or others while upon the land after the vendee has taken possession by any dangerous condition, whether natural or artificial, which existed at the time that the vendee took possession." This rule, primarily attributed to the ancient doctrine of *caveat emptor*, is said to have retained its force for a variety of reasons, including public policy concerns,[6] the importance attached to deeds,[7] the lack of standards of quality or use of land, and the fact that vendees generally make prepurchase investigations of real estate and therefore are assumed to accept it "as is."[8] With respect to this last noted rationale, it has been said:

[I]n the absence of *express agreement* or misrepresentation, the purchaser is expected to make his own examination and draw his own conclusions as to the condition of the land; and the vendor is, in general, not liable for any harm resulting to him or others from any defect existing at the time of transfer.[9]

3. *Weber,* 725 P.2d at 1363.

4. *Preston v. Goldman,* 42 Cal.3d 108, 114–15, 720 P.2d 476, 479, 227 Cal.Rptr. 817, 820 (1986) (en banc).

5. *Id.* at 115–16, 720 P.2d at 479–80, 227 Cal.Rptr. at 820–21.

6. *Smith v. Tucker,* 151 Tenn. 347, 362, 270 S.W. 66, 70 (1925).

7. *Id.*

8. W. Keaton & W. Prosser, *Prosser & Keaton on the Law of Torts* § 64, at 447 (5th ed. 1984).

9. *Id.* (footnotes omitted; emphasis added). Comment a of the Reporter's notes to section 352 of the Restatement (Second) of Torts (1965) states:

Under the ancient doctrine of caveat emptor, the original rule was that, in the absence of *express agreement,* the vendor of land was not liable to his vendee, or a fortiori to any other person, for the condition of the land existing at the time of transfer. As to sales of land

■ Despite the varying approaches discussed above and the exceptions discussed more thoroughly below, the Lovelands do not dispute the soundness of the above-quoted portion of the Restatement rule. Instead, they contend that an *express agreement* existed under which Brown Brothers was required by Orem City to fence the canal. The existence of an express agreement is not, as suggested by the Lovelands, an exception to the Restatement's rule, but simply another relationship out of which a duty of care may arise. In any event, the record does not reflect that the Lovelands raised this issue below. In fact, in their opposition to Brown Brothers' renewed motion for summary judgment, the Lovelands argued that fencing plat B was "implicitly required" by Orem City. The Lovelands may not raise the "express agreement" argument for the first time on appeal.[10]

Nor is the Lovelands' related argument, which attempts to draw analogies to landlord-tenant cases, well taken. They claim

that the basis of such cases is the landlord's control of the premises. The Lovelands conclude that since the principle limiting negligence in landlord-tenant and vendor-vendee cases is the same (that is, control), the issue of Brown Brothers' control over the subject property should have gone to the jury.[11]

■ Although attempts to establish vendor liability by analogy to landlord-tenant cases have been rejected in the past,[12] one of the more pragmatic rationales for the above-quoted portion of the Restatement's rule is that vendor liability should be coextensive with possession and/or control and the corresponding ability to prevent exposure to liability.[13] Thus, even where bare legal title has been divested, liability has been imposed where a vendor continued to exercise possession or control.[14] Here, however, there is no reasonable dispute regarding the fact that Brown Brothers had no right to control, supervise, or otherwise enter upon the Lovelands' property.[15]

---

this rule has retained much of its original force.... This is perhaps because great importance always has been attached to the deed of conveyance, which is taken to represent the full agreement of the parties, and to exclude all other terms and liabilities. The vendee is required to make his own inspection of the premises, and the vendor is not responsible to him for their defective condition, existing at the time of transfer.
(Emphasis added.)

**10.** *See, e.g., Insley Mfg. Corp. v. Draper Bank & Trust,* 717 P.2d 1341, 1347 (Utah 1986).

**11.** The retaining of control as a basis for imposing a duty on landlords has been discussed in many cases. *E.g., Williams v. Melby,* 699 P.2d 723, 726 (Utah 1985); *Ayala v. B & B Realty Co.,* 32 Conn.Sup. 58, 337 A.2d 330, 332 (Conn.Super. Ct.1974).

**12.** *E.g., Combow v. Kansas City Ground Inv. Co.,* 358 Mo. 934, 939, 218 S.W.2d 539, 541 (1949); *Sarnicandro v. Lake Dev., Inc.,* 55 N.J.Super. 475, 480, 151 A.2d 48, 51 (N.J.Super.Ct.App.Div. 1959).

**13.** *See Brock v. Rogers & Babler, Inc.,* 536 P.2d 778, 782 (Alaska 1975) (Restatement (Second) of Torts § 352 (1965) grounded upon policy which seeks to limit liability to persons in possession and control of property); *cf. Preston,* 42 Cal.3d at 117–20, 125–26, 720 P.2d at 481–83, 487, 227 Cal.Rptr. at 822–24, 828 (absence of possession

and control justifies departure from Cal.Civ. Code § 1714).

**14.** *Marsden v. Eastern Gas & Fuel Assocs.,* 7 Mass.App. 27, 385 N.E.2d 528, 530 (1979); *cf. Ward v. Enevold,* 504 P.2d 1108, 1110 (Colo.Ct. App.1972) (not selected for official publication) (tenant liable for slip and fall on parking lot extending onto unleased property), *cert. denied,* Jan. 15, 1973.

**15.** The Lovelands' reliance upon *Corcoran v. Village of Libertyville,* 73 Ill.2d 316, 22 Ill.Dec. 701, 383 N.E.2d 177 (1978), is unpersuasive. Unlike this Court, the Illinois Supreme Court has abolished the attractive nuisance doctrine and has established a test of foreseeability in its place. *Corcoran's* extension of a duty to noowners/nonpossessors was based on the court's new foreseeability test. *Compare Cope v. Doe,* 102 Ill.2d 278, 285–86, 80 Ill.Dec. 40, 43–44, 464 N.E.2d 1023, 1026–27 (1984), *with LaSalle Nat'l Bank v. City of Chicago,* 132 Ill. App.3d 607, 612–14, 88 Ill.Dec. 102, 105–06, 478 N.E.2d 417, 420–21 (1985).

The Lovelands' suggestion that liability may be grounded upon nuisance theory is without merit for several reasons, including the fact that Brown Brothers relinquished possession and control long before the incident at hand. *See Ayala,* 337 A.2d at 332; *Sarnicandro,* 55 N.J.Super. at 480, 151 A.2d at 51; Restatement (Second) of Torts § 373 (1965).

Thus, the claim that a factual question exists is without merit.

The Restatement (Second) of Torts has recognized two exceptions to the *caveat emptor* approach embodied in that portion of section 352 quoted above. The first exception involves a vendor's duty to disclose to the vendee any *concealed* conditions known to the vendor which involve an unreasonable danger.[16] The second exception is that a vendor owes a duty for a reasonable time to those outside the land who are injured after the sale by a dangerous condition on the land.[17] In this case, we are not dealing with a person who was outside the land at the time of the injury. Nor are we dealing with a concealed condition. Moreover, under both of the above exceptions, knowledge of the defect on the part of the vendee relieves the vendor of any duty or liability.[18]

The record reflects that Brown Brothers' vendee, John Atkinson, knew of the canal and its dangerous characteristics. In his deposition, James Loveland testified that when he expressed to Atkinson his and his wife's concern over the exposed canal, Atkinson told him not to worry because the canal would be fenced. Additionally, $200 was placed in escrow to provide for fencing the canal, and James Loveland testified that these funds may have been withheld from Atkinson's proceeds. This testimony, in conjunction with that concerning the physical dimensions of the canal and the nature of the development of the property, is sufficient to infer that Atkinson knew of the canal and the potential hazard it created. Therefore, Brown Brothers owed no duty pursuant to the exceptions to the general rule found in the Restatement (Second) of Torts.[19]

The Lovelands contend that they did not sue Brown Brothers in its capacity as a vendor of lot sixteen, but rather as the developer of the property. Brown Brothers, without authority, claims that this distinction is of no legal consequence. We disagree. Although there has been no wholesale importation of the principles underlying products liability into the real estate context, some exceptions have arisen where the prior landowner was a professional developer.[20]

The Lovelands claim that a developer is subject to liability for physical harm or death resulting from its negligence in the development of real estate. In support of this claim, they cite several cases which

---

16. Restatement (Second) of Torts § 353 (1965) provides:

(1) A vendor of land who conceals or fails to disclose to his vendee any condition, whether natural or artificial, which involves unreasonable risk to persons on the land, is subject to liability to the vendee and others upon the land with the consent of the vendee or his subvendee for physical harm caused by the condition after the vendee has taken possession, if

(a) the vendee does not know or have reason to know of the condition or the risk involved, and

(b) the vendor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to belief that the vendee will not discover the condition or realize the risk.

(2) If the vendor actively conceals the condition, the liability stated in Subsection (1) continues until the vendee discovers it and has reasonable opportunity to take effective precautions against it. Otherwise the liability continues only until the vendee has had reasonable opportunity to discover the condition and to take such precautions.

17. Restatement (Second) of Torts § 373 (1965).

18. *See Christy v. Prestige Builders, Inc.,* 415 Mich. 684, 694–96, 329 N.W.2d 748, 752 (1982); *see also Higgenbottom v. Noreen,* 586 F.2d 719, 720–21 (9th Cir.1978); *Lake v. United States,* 522 F.Supp. 166, 168 (N.D.Ill.1981); *Aitken v. Starr,* 99 N.M. 598, 601, 661 P.2d 498, 501 (N.M.Ct. App.), *cert. denied,* 99 N.M. 644, 662 P.2d 645 (1983); Restatement (Second) of Torts §§ 12(1), 353 comments b, d (1965). *But see Farragher v. City of New York,* 26 A.D.2d 494, 275 N.Y.S.2d 542 (1966), *aff'd,* 21 N.Y.2d 756, 288 N.Y.S.2d 232, 235 N.E.2d 218 (1968).

19. *See Christy,* 415 Mich. at 694–96, 329 N.W.2d at 753.

20. *Preston,* 42 Cal.3d at 117 n. 3, 720 P.2d at 481 n. 3, 227 Cal.Rptr. at 822 n. 3. *But see, e.g., Chapman v. Lily Cache Builders, Inc.,* 48 Ill.App. 3d 919, 922–23, 6 Ill.Dec. 176, 179, 362 N.E.2d 811, 814 (1977). That such exceptions might exist is supported by our cases limiting application of the "accepted-work doctrine." *Compare Williams,* 699 P.2d at 729, *with Leininger v. Stearns–Roger Manf. Co.,* 17 Utah 2d 37, 41, 404 P.2d 33, 36 (1965).

recognize that a duty of care arises out of a building contractor's and/or developer's contract upon which an action in tort may lie for negligence which causes personal injury and varying types of property damage.[21] These cases state the scope of this duty in many ways. Additionally, the Lovelands rely on Justice Cardozo's opinion in *MacPherson v. Buick Motor Co.,*[22] which in essence held that a duty may exist irrespective of a contractual relationship.[23]

■ Although *MacPherson* involved the duty of a supplier of chattels, modern courts have held that purchasers of real estate may recover from a contractor for his or her negligence despite the lack of privity.[24] However, neither Brown Brothers nor the Lovelands have adequately briefed the Court concerning whether a nonbuilding subdivider owes a duty to subvendees and, if so, the scope of that duty. The Wyoming Supreme Court is one of the courts which have recently dealt with this issue. In *Anderson v. Bauer,*[25] a defendant developer purchased raw acreage and subdivided the same into residential building lots. These lots were in turn sold to defendant builders who constructed houses thereon that were later purchased by eight plaintiff owners. The plaintiffs sued after they experienced water seepage into their basements.[26] In reversing the judgment against the defendant developer, the court stated:

> Development of new land into subdivided lots for building, with streets, sewer, water and utilities is a necessary and beneficial activity that ought to be encouraged. The developer ought to also

have responsibility for his activities. Yet, he should not be subject to liability for all misfortune that might befall a purchaser. Thus, it is reasonable that, where land is subdivided and sold for the purpose of constructing residential dwelling houses, the developer has a duty to exercise reasonable care to insure that the subdivided lots are suitable for construction of some type of ordinary, average dwelling house *and he must disclose to his purchaser any condition which he knows or reasonably ought to know makes the subdivided lots unsuitable for such residential building.* He has a further duty to disclose, upon inquiry, information he has developed in the course of the subdivision process which is relevant to suitability of the land for its expected use.[27]

We do not interpret this duty to extend to deficiencies in residential building lots that are easily discernible during an ordinary and reasonable investigation by a purchaser and that are in fact known of by the purchaser.[28] The limitation seems necessary inasmuch as purchasers are often willing to accept known deficiencies in land in exchange for a lower purchase price. This, of course, does not follow with regard to latent defects, those which a buyer cannot reasonably be expected to discover.[29]

The duty defined by the Wyoming court and our interpretation thereof is consistent with existing Utah law. Although not raised by the parties, perhaps due to its nonapplicability by reason of reliance on an exemption, Utah has enacted the "Utah Uniform Land Sales Practices Act."[30] Although not controlling in the instant case,

---

21. *E.g., Wright v. Creative Corp.,* 30 Colo.App. 575, 498 P.2d 1179 (1972).

22. 217 N.Y. 382, 111 N.E. 1050 (1916).

23. *Id.* at 389, 111 N.E. at 1053.

24. *Cosmopolitan Homes, Inc. v. Weller,* 663 P.2d 1041, 1044–45 (Colo.1983) (en banc) (and cases cited therein); *Kristek v. Catron,* 7 Kan.App.2d 495, 644 P.2d 480 (1982).

25. 681 P.2d 1316 (Wyo.1984).

26. *Id.* at 1319–20.

27. *Id.* at 1323 (emphasis added).

28. The result of applying this interpretation is not inconsistent with the results in cases similar to the one at bar. *E.g., Green Springs, Inc. v. Calvera,* 239 So.2d 264, 265 (Fla.1970); *Village Dev. Co. v. Filice,* 90 Nev. 305, 307–08, 526 P.2d 83, 84 (1974).

29. *Cf. Cosmopolitan Homes, Inc.,* 663 P.2d at 1045–46 (allowing buyer of used home to recover against builder on negligence theory only for latent defects).

its provisions are persuasive in fashioning the duty of a subdivider to his vendees. Unless exempted by Utah Code Ann. § 57–11–4 (Supp.1987), Utah Code Ann. § 57–11–5(1), (4) (Supp.1987) requires that subdivided land be registered before it can be sold and that the purchaser receive a "public offering statement" before the disposition of the land.[31] Utah Code Ann. § 57–11–7 (1986) provides, in pertinent part: "(1) Every public offering statement shall disclose fully and accurately the physical characteristics of the subdivided lands offered and shall make known to prospective purchasers *all unusual and material circumstances or features* affecting the subdivided lands." (Emphasis added.) Utah Code Ann. § 57–11–17 (1986) provides in part:

> (1) Any person who:
> ...;
>> (c) in disposing of subdivided lands, omits a material fact required to be stated in a registration statement, public offering statement, statement of record or public report, necessary to make the statements made not misleading;
> is liable as provided in this section to the purchaser unless, in the case of an untruth or omission, it is proved that the purchaser knew of the untruth or omission or that the person offering or disposing of subdivided lands did not know and in the exercise of reasonable care could not have known of the untruth or omission.

Clearly the imposition of liability pursuant to subsection 57–11–17(1)(c) is limited in part to negligent or intentional omissions made in the course of the disposition of real estate and requires that the vendee did not know or could not have known of the

omission. The duty enunciated by the Wyoming court in *Anderson* is consistent with this scheme.

The above analysis was utilized in *Stepanov v. Gavrilovich*,[32] wherein the Alaska Supreme Court discussed the duties subdividers owe to their vendees. *Stepanov* was in turn relied upon by the court in *Anderson*.[33]

■ Assuming that the canal constituted a hazard which made lot sixteen unsuitable for residential building purposes, all the evidence supports the conclusion that Atkinson knew of the canal and the danger it imposed. Moreover, although not necessary to this analysis, the Lovelands were well aware of the problem. We hold that there was no evidence to establish that Brown Brothers breached the above-described duty of care.[34]

The Lovelands alternatively claim that Brown Brothers may be held liable upon a strict liability theory. Specifically, the Lovelands rely upon our adoption of the Restatement (Second) of Torts § 402A (1965) in *Ernest W. Hahn, Inc. v. Armco Steel Co.*[35] They claim that the doctrine of strict liability has been repeatedly applied to real estate transactions.

■ The doctrine of strict liability has not been applied to residential subdividers in Utah. Although such a theory has some appeal from a risk-spreading standpoint and because of the obvious reliance house buyers place on developer expertise, we are not persuaded that the doctrine should be applied in this case. The Lovelands' briefing is simply inadequate. They have not provided any serious analysis of the issue, nor have they provided the Court with the necessary underpinnings for such a rule.

---

30. Utah Code Ann. §§ 57–11–1 to –21 (1986 & Supp.1987).

31. We are mindful that subsection (3) does not allow civil liability for failing to deliver such a statement.

32. 594 P.2d 30 (Alaska 1979).

33. 681 P.2d at 1322.

34. The Lovelands' reliance upon *Fisher v. Morrison Homes, Inc.,* 109 Cal.App.3d 131, 167 Cal. Rptr. 133 (1980), is misplaced. That case clearly turned upon the unclear distribution of liability between the public and private developers which arises as a consequence of dedicating land which is part of a subdivision. *Id.* at 136, 167 Cal.Rptr. at 135–36.

35. 601 P.2d 152, 158 (Utah 1979).

All of the cases cited by the Lovelands, with the exception of one, deal only with the mass housing developer or the installation of faulty products into homes. Only in the California case of *Avner v. Longridge Estates* [36] did a court rule that a "manufacturer" of a residential lot may be held strictly liable in tort for damage suffered by the owner as a proximate result of defects in the manufacturing process. [37]

Although the early progeny of *Greenman v. Yuba Power Products, Inc.*, [38] which established the doctrine of strict liability in the state of California, held the doctrine inapplicable to real property, more recent California cases have eroded this distinction. In *Kriegler v. Eichler Homes, Inc.*, [39] the court of appeals held that the doctrine of strict liability could be applied to a builder/developer of mass-produced homes for defectively installed radiant heating systems. [40] In *Avner*, the court relied upon *Kriegler* to extend the doctrine of strict liability in tort to building lot "manufacturers" for damages suffered by an owner as a proximate result of defects in the manufacturing process (cutting, filling, grading, compacting, etc.) causing subsidence. [41] Yet *Avner* and *Kriegler* involved injury suffered as the result of latent defects. [42] In none of the cases relied upon by the Lovelands has recovery been allowed for obvious deficiencies in the real estate itself. The Lovelands have not advanced a sound reason to make such an extension.

We have a further reason for declining the Lovelands' invitation to extend the doctrine of strict liability to Brown Brothers in this case. As noted above, the Utah legislature has adopted the Utah Uniform Land Sales Practices Act. The legislature has thus seen fit to impose controls on the activities of large-scale subdividers. One of these controls is civil liability when subdividers fail to disclose to a purchaser any unusual and material circumstance affecting subdivided lands. [43] It would be inappropriate for this Court to circumvent these limits thereon by adopting a new model for liability. [44] For the above reasons, the trial court did not err in granting Brown Brothers' motion for summary judgment.

## III

## NORTH UNION

■ The Lovelands' second point is that the district court erred by granting summary judgment in favor of North Union. Specifically, the Lovelands contend that a question of fact existed as to whether North Union exercised reasonable care in maintaining its canal. Since we hold that North Union owed no duty to Michael Loveland, we need not reach this issue.

On appeal, the Lovelands claim that North Union may be held liable for negligence. They rely on the attractive nuisance doctrine to provide the required duty of care. In *Weber v. Springville City*, [45] we noted that except for the duty to refrain from willful and wanton conduct, generally no duty arises out of the relationship between an owner/possessor and a trespasser. [46] The attractive nuisance doctrine evolved as an exception to this rule when a trespassing child is involved. [47] Although the parties argue over whether North Union was an owner/possessor and whether Michael Loveland was therefore a trespasser, because of our resolution of this point,

36. 272 Cal.App.2d 607, 77 Cal.Rptr. 633 (1969).

37. 77 Cal.Rptr. at 639.

38. 59 Cal.2d 57, 377 P.2d 897, 27 Cal.Rptr. 697 (1962).

39. 269 Cal.App.2d 224, 74 Cal.Rptr. 749 (1969).

40. 74 Cal.Rptr. at 752.

41. 74 Cal.Rptr. at 751–53.

42. *Avner*, 77 Cal.Rptr. at 639; *Kriegler*, 74 Cal. Rptr. at 752.

43. Utah Code Ann. § 57–11–17(1)(c) (1986).

44. *See Stepanov*, 594 P.2d at 35.

45. 725 P.2d 1360.

46. *Id.* at 1365.

47. *Id.*

we need not decide these issues in this case.[48]

The Lovelands additionally urge that proof of allurement is no longer a prerequisite to imposition of liability under the attractive nuisance doctrine and invite us to adopt Restatement (Second) of Torts § 339 (1965). However, as in the *Weber* case, whether this case is analyzed under the attractive nuisance doctrine as enunciated in *Brown v. Salt Lake City*[49] or under the Restatement's rule is not outcome determinative.[50]

We have reviewed all of our cases which discuss the attractive nuisance doctrine. In the main, it is evident from these cases that the rule is to be applied contextually.[51] However, we acknowledge that some of our cases have held that *certain conditions* will not be treated as attractive nuisances. In Utah, these fixed rules have in general been limited to water hazard and construction cases.[52] There appears to be a trend to reject all fixed and arbitrary categories and to require each case to be considered in light of its own peculiar facts.[53] And as just stated, most of our cases are in accord with this view. Nevertheless, after carefully reviewing our cases

and all those cited by the parties, we follow those of our cases which hold that owners/possessors of canals are not subject to liability under the attractive nuisance doctrine.[54] The Court recognizes that those cases did not deal with canals similar in character to North Union's canal. Yet the reasoning underlying those decisions justifies an extension of their precedent in this case.

Our decision to disallow recovery based upon the attractive nuisance doctrine in this case by focusing upon the nature of the physical hazard as opposed to the unreasonableness of the specific risk created is predicated in part upon the fact that the doctrine in Utah is a creature of this Court. We therefore have the responsibility of carefully tailoring the rule's applicability in a manner consistent with the policies of this state.

This Court has previously recognized that agriculture in this state has from the beginning depended to a great extent upon irrigation.[55] This is true because Utah is located in a high and arid region of the United States.[56] Thus the utility of irrigation canals, not only to the owner/possessor of such canals, but to the public as a

---

48. For an example of a case discussing these issues and applying the Restatement of Torts § 339 (1934) to an easement holder, see *Cooper v. City of Reading,* 392 Pa. 452, 140 A.2d 792 (1958).

49. 33 Utah 222, 93 P. 570 (1908). In *Brown,* the Court stated:

[T]he doctrine of the turntable cases should be applied to all things that [1] are uncommon and [2] are artificially produced, and [3] which are attractive and alluring to children of immature judgment and discretion, and [4] are inherently dangerous, and [5] where it is practical to guard them without serious inconvenience and without great expense to the owner.

*Id.* at 240, 93 P.2d at 576. If a trespassing child's injuries are caused by a property owner/possessor's failure to exercise reasonable care to safeguard children from a condition subject to the doctrine, then the child may recover. *Weber,* 725 P.2d at 1365.

50. *See* 725 P.2d at 1365.

51. *E.g., Peterson v. Farmers' Grain & Milling Co.,* 69 Utah 395, 400–01, 255 P. 436, 438 (1927); *Payne v. Utah–Idaho Sugar Co.,* 62 Utah 598, 607–09, 221 P. 568, 571–72 (1923); *Bogdon v.*

*Los Angeles & Salt Lake Ry. Co.,* 59 Utah 505, 514–16, 205 P. 571, 575–78 (1922).

52. *Featherstone v. Berg,* 28 Utah 2d 94, 95, 498 P.2d 660, 661 (1972); *Taylor v. United Homes, Inc.,* 21 Utah 2d 304, 305, 445 P.2d 140, 141 (1968); *Brinkerhoff v. Salt Lake City,* 13 Utah 2d 214, 215, 371 P.2d 211, 212 (1962); *Charvoz v. Salt Lake City,* 42 Utah 455, 468–69, 131 P. 901, 906–07 (1913).

53. W. Keaton & W. Prosser, *Prosser & Keaton on the Law of Torts* § 59, at 405–08, 408 n. 92 (5th ed. 1984) (and cases cited therein).

54. *Brinkerhoff,* 13 Utah 2d at 215, 371 P.2d at 212; *Charvoz,* 42 Utah at 468–69, 131 P. at 906–07.

55. *Erickson v. Bennion,* 28 Utah 2d 371, 373, 503 P.2d 139, 140 (1972). The Lovelands' reliance on cases such as *Erickson* for a duty is misplaced inasmuch as these cases speak to the statutory duty not to cause injury to neighboring property. *See* Utah Code Ann. § 73–1–8 (1980).

56. 28 Utah 2d at 373, 503 P.2d at 140.

whole, is of great significance. In many areas of this state, the economic livelihood and well-being of its people depend upon the existence of imported waters.

The Lovelands do not dispute the importance of irrigation water to this state. Instead, they claim that whether liability should be imposed in this case should be decided by a jury and turn upon the special facts of this case. They further claim that to allow the case to go to the jury based upon the attractive nuisance doctrine given the unique facts at hand would not impede delivery of irrigation waters. We disagree.

It seems inescapable that in certain areas, safety measures to prevent accidents such as the one in this case are necessary. Yet it is equally obvious that it would be inappropriate for this Court to establish some blanket protective measure for all inhabited areas. Because of variations in population density and composition, different areas require that different safety measures be taken. As population centers shift and evolve, the type of measures needed necessarily changes. Given the importance of water to the state, the fact that the burden of providing blanket safeguards for children would unduly hinder, if not prevent, the economical conduct of such a necessary and highly beneficial enterprise (importing water), and the fact that ditches and canals might be rendered sufficiently safe by varying safety measures, it would appear that local governments are best suited to impose fencing or other protective requirements. Local governments have the necessary framework in place for making carefully reasoned and tailored decisions concerning such safety measures. They are best suited to balance all of the interests in their respective communities in a way this Court cannot. Many local governments have already assumed this duty and have imposed fencing require-ments on subdividers through the passage of local ordinances.[57]

The potential economic exposure which would be engendered by allowing a cause of action to be brought against irrigation companies in cases such as this could unnecessarily impede the importation of waters since alternative solutions to the problem before us, with substantially less devastating economic and social consequences, exist. If we were to adopt the Lovelands' position, North Union and other irrigation companies would be required to fence or cover, as a practical precautionary measure, or procure liability insurance for all similar canals in proximity to inhabited areas. This burden would necessarily be extremely costly. The Court's concern about the cost of imposing liability was implicit in *Charvoz v. Salt Lake City*,[58] where the Court made the following observations:

> It appears from the record in the case at bar, as coming from a witness who was well qualified to testify upon the subject, that in Salt Lake City there were 500 miles of open ditches carrying water along the sides of the streets in a similar manner to that carried by the stream in question at the time of the accident.... If it were held to be negligence, therefore, for the city to maintain the stream in question uncovered, how could it be held that it was not equally negligent in permitting any other streams, whether larger or smaller, to remain uncovered?[59]

We conclude that, as a matter of law, recovery against North Union cannot be had in this case by resort to the attractive nuisance doctrine. Whether the attractive nuisance doctrine may afford relief in a case not involving the use of canals or canal banks is left to be decided another day.[60]

**57.** *E.g.,* Salt Lake County, Utah, Rev. Ord. § 18.24.140 (1986); Salt Lake City, Utah, Rev. Ord. § 42–5–2 (1986).

**58.** 42 Utah at 468, 131 P. at 906.

**59.** *Id.* at 468–69, 131 P. at 907.

**60.** The *Charvoz* case relied in part on *Salladay v. Old Dominion Copper Mining Co.,* 12 Ariz.

124, 100 P. 441 (1909). In *Harris v. Buckeye Irrigation Co.,* 118 Ariz. 498, 578 P.2d 177 (1978) (en banc), *on remand,* 131 Ariz. 540, 642 P.2d 885 (Ariz.Ct.App.1982), *review denied,* Mar. 23, 1982, the Arizona Supreme Court said:

> We believe that the facts of the instant case can be distinguished from previous cases of this court and the Court of Appeals. In the instant case, the defendant placed a bridge at

## IV

## OREM CITY

The Lovelands' final point is that Orem City is not immune from suit under the provisions of the Utah Governmental Immunity Act.[61] Orem City moved for summary judgment in the district court on the ground that it was immune under the Act. The district court granted that motion and dismissed the complaint as against Orem City with prejudice.

In cases where a governmental entity's right to assert immunity is being challenged, the threshold question generally is whether the claimant's injuries resulted from the exercise of a governmental function. This is so because the right to maintain an action against the state or its political subdivisions may result (1) from a finding that the injury did not result from the exercise of a governmental function, or (2) from a finding that even though the injury resulted from the exercise of a governmental function, the government's immunity has been expressly waived in one of the sections of the Act.[62] The Lovelands first contend that their injuries resulted from Orem City activities of a nongovernmental nature.

Section 63-30-3 of the Act provides, in pertinent part: "Except as may be otherwise provided in this chapter, all governmental entities are immune from suit for any injury which results from the exercise of a governmental function...."[63] In *Standiford v. Salt Lake City Corp.*,[64] the Court adopted the following approach for determining whether the activities of a governmental entity were within the exercise of a governmental function: "[T]he test for determining governmental immunity is whether the activity under consideration is of such a unique nature that it can only be performed by a governmental agency or that it is essential to the core of governmental activity."[65]

a point where it could be anticipated that the public would use it to cross the canal. Because of the location of the high school, the baseball field, and the swimming pool, it could reasonably be expected that children as well as adults would use this bridge. The defendant also had ample notice of the fact that the bridge was potentially dangerous. The bridge was, in fact, open to the public generally and the defendants did nothing either to restrict the use of the bridge by the public or to make it safe for the persons they knew were using the bridge.

....

The immunity given to irrigation districts in *Salladay*, supra, was based in sound public policy at the time. *It is sound public policy today as far as the use of canals and canal banks are concerned.* Unfortunately, this immunity sometimes leads to the callous "public be damned" policy exemplified by the testimony of the manager of the defendant irrigation company in the instant case. The statement of the manager that it was "not my responsibility to see that everything on our canal system is safe for anybody's use" and that he is only concerned with the safety of his employees and not anyone else's, is the direct result of the belief by the irrigation company that because of *Salladay*, supra, it had absolute immunity from suit.

As this matter was decided on motion for summary judgment, all the facts were not developed. Assuming, however, that the judge or jury finds, after hearing all of the evidence at trial, that Marlon Harris fell from the bridge in question as the result of negligence on the part of the defendants or their employees in the building or maintenance of the bridge, we feel that under the peculiar facts of this case public policy does not require the application of the *Salladay* immunity doctrine. This, it seems, is the only way that the defendants and others in like situations can be prevented from using a grant of immunity as an excuse not to exercise reasonable care to protect the members of the public from a negligently constructed and maintained bridge they knew was being used by the public.

*Id.* at 501–02, 578 P.2d at 180–81 (emphasis added).

61. Utah Code Ann. §§ 63-30-1 to –38 (1986 & Supp.1987).

62. *Cox v. Utah Mortgage & Loan Corp.*, 716 P.2d 783, 785 (Utah 1986); *Madsen v. Borthick*, 658 P.2d 627, 630 (Utah 1983).

63. Utah Code Ann. § 63-30-3 (1986). Although the provisions of this section have been amended three times since this incident arose, none of the amendments affect our analysis in this case. *See* Act of Feb. 25, 1985, ch. 93, § 1, 1985 Utah Laws 170; Act of Jan. 28, 1984, ch. 33, § 1, 1984 Utah Laws 148, 148; Act of March 5, 1981, ch. 116, § 2, 1981 Utah Laws 566, 567.

64. 605 P.2d 1230 (Utah 1980).

65. *Id.* at 1236–37.

In *Johnson v. Salt Lake City Corp.*,[66] Justice Oaks, writing for a majority of the Court, reaffirmed and clarified the test laid down in *Standiford:*

> The first part of the *Standiford* test—activity of such a unique nature that it can only be performed by a governmental agency—does not refer to what government *may* do, but to what government alone *must* do.... [T]he second part of the *Standiford* test—"essential to the core of governmental activity"—... refers to those activities not unique in themselves (and thus not qualifying under the first part) but [to those activities] essential to the performance of those activities that are uniquely governmental.[67]

In their brief, the Lovelands rely on several Orem City activities they claim were of a nongovernmental nature, namely, (1) the City Planning Commission's receipt and analysis of the subdivision plat; (2) the Commission's recommendation to approve the plat, subject to the installation of various improvements; (3) the review and approval of the plat by the Orem City Council; (4) the monitoring by Orem City employees of the construction and development of Executive Estates; (5) the Orem City Planning Commission's recommendation (or lack thereof) to the Orem City Council that the canal be fenced in plat B of Executive Estates; and (6) assuming such a recommendation was made, the failure of the city engineer or other city employees charged with supervising and monitoring construction of the subdivision to insure that the fence was in fact constructed as was required.

Orem City responds that these activities are simply an exercise of its inherent police powers which have been codified by the legislature.[68] It claims that since these powers may not be surrendered, their exercise by Orem City can only be performed by a governmental agency and thus are also "essential to the core of governmental activity." However, as was suggested in *Thomas v. Clearfield City*,[69] while legislative delegation of certain powers and duties surely establishes that the exercise and performance thereof is a governmental function for purposes of a political subdivision's authority to operate, it does not automatically follow that the function qualifies as a "governmental function" for purposes of governmental immunity analysis under *Standiford.*[70]

█ The activities numbered four and six above and relied upon by the Lovelands need not be reviewed. As indicated, there is no evidence in this case that Orem City required plat B to be fenced. The activities numbered one, two, three, and five above all relate to review and approval of plat B of Executive Estates. We therefore direct our attention to these latter activities.

The Lovelands contend that Orem City engaged in the activities to further the health and safety of future Executive Estates residents. The Lovelands claim that the forces of private enterprise demand that certain health and safety considerations be taken into account when developing property. They therefore conclude that such activities are not of a type government alone must do. In *Madsen v. Borthick*, the Court made the following observations:

> *Standiford*'s reference to activities that "can only be performed by a governmental agency" does not preclude governmental immunity for supervisory functions in some respects similar to those that could be performed by a private association authorized by agreement, such as self-regulation by an industry. *Thomas v. Clearfield City*, Utah, 642 P.2d 737 (1982), is not to the contrary. In that case, we held that sovereign immunity did not protect a municipality from liability for negligent maintenance

---

66. 629 P.2d 432 (Utah 1981).

67. *Id.* at 434 (emphasis in original).

68. Specifically, Orem City relies upon Utah Code Ann. §§ 10–2–401, 10–9–1, –4 (1986); *see*

*also State v. Hutchinson,* 624 P.2d 1116 (Utah 1980).

69. 642 P.2d 737 (Utah 1982).

70. *See id.* at 739.

of its sewer system, noting that the municipality's power to provide sewer service was insufficient to establish sewer service as a "governmental function" where the function could also be performed privately. The difference between *Thomas* and this case is a difference in the nature of the services performed by the governmental unit. Publicly provided sewer services and privately provided sewer services can be essentially the same. But governmental supervision of financial institutions in the public interest, which includes the exercise of discretionary powers delegated by law, and private oversight by voluntary association of businesses are qualitatively different. The former can be performed only by a government agency. Thus, unlike the provision of sewer services, the governmental activity in this case qualifies as a "governmental function." [71]

The difference in the nature of the planning and supervisory services provided by city planners and those provided by private sector developers is qualitatively different. Only governmental agencies such as the Orem City Planning Commission and the Orem City Council can realistically balance *all* of the competing interests when land is developed. Only they, through their supervisory roles, can impose restrictions which best achieve necessary levels of safety for future residents. [72]

We hold that the activities relied upon by the Lovelands were in the exercise of a governmental function. Since we hold that the activities of Orem City were within the exercise of a governmental function, the City is immune from suit unless such immunity has been waived.

The Lovelands alternatively contend immunity was waived in this case. Specifically, the Lovelands rely upon the waivers found in Utah Code Ann. §§ 63–30–8, –9,

–10(1) (1986). Section 63–30–8 provides: "Immunity from suit of all governmental entities is waived for any injury caused by the defective, unsafe, or dangerous condition of any highway, road, street, alley, crosswalk, sidewalk, culvert, tunnel, bridge, viaduct or other structure located thereon." Section 63–30–9 provides: "Immunity from suit of all governmental entities is waived for any injury caused from a dangerous or defective condition of any public building, structure, dam, reservoir or other public improvement. Immunity is not waived for latent defective conditions."

The Lovelands urge that this case comes within these waivers of immunity for several reasons. They claim that North Union's canal comes within the definition of a culvert and argue that the minutes of the City Council meetings indicate the City was aware of the canal that ran through the Executive Estates subdivision and the potential danger it presented to that subdivision's residents. Additionally, they claim the Executive Estates subdivision is a "public improvement" which, without adequate implementation of a directive to fence the canal, created a dangerous condition which resulted in their son's death.

▮ The fallacy in the Lovelands' reasoning is their assumption that sections 63–30–8 and 63–30–9 apply to defective, unsafe, or dangerous conditions on property which is not in the "public use." [73] This assumption is unsound. Although none of our cases have directly dealt with this issue, common sense dictates that adoption of the Lovelands' construction would go far beyond the intended scope of the waivers. And all of our case law is consistent with this decision. For example, in *Stevens v. Salt Lake County,* [74] the plaintiff was injured when he drove his motorbike from a pathway crossing a vacant lot onto an unimproved county road, where he was struck

---

71. 658 P.2d at 631.

72. At the time of oral argument, the Lovelands relied upon *Cox,* 716 P.2d 783, in support of their contention that the activity of Orem City was nongovernmental. However, that case is readily distinguishable on its facts because the activity there was an escrow function with no aspects of uniqueness, but was capable of being performed by anyone.

73. *See Ingram v. Salt Lake City,* 733 P.2d 126, 127 (Utah 1987) (per curiam).

74. 25 Utah 2d 168, 478 P.2d 496 (1970).

by a passing motorist. The plaintiff claimed that the weeds and brush growing *alongside* the county road on the vacant lot obscured his vision and caused the accident, thus constituting a "defective, unsafe, or dangerous condition" for which immunity was waived pursuant to section 63–30–8.[75] In affirming the summary judgment in favor of Salt Lake County, the Court noted:

> Our concern is with the particular facts shown in this case: Where the pathway upon which plaintiff traveled and entered into Spring Lane was upon private property, and upon which were growing whatever weeds and brush obstructed his view. It would place a wholly impractical burden upon counties if they had to assume the duty of correcting such conditions with respect to every private way that enters upon a public road.[76]

Additionally, none of our cases have suggested that a "public improvement" as is specified in section 63–30–9 refers to private developments.[77]

The Lovelands finally rely upon the waiver of immunity found in section 63–30–10. That provision provides, in pertinent part:

> (1) Immunity from suit of all governmental entities is waived for injury proximately caused by a negligent act or omission of an employee committed within the scope of employment except if the injury:
>
> . . .;
>
> (c) arises out of the issuance, denial, suspension, or revocation of, or by the failure or refusal to issue, deny, suspend, or revoke, any permit, license, certificate, approval, order, or similar authorization; or
>
> . . .;
>
> (f) arises out of a misrepresentation by the employee whether or not it is negligent or intentional. . . .

The briefs of the parties address at length whether Orem City owed the Lovelands a duty in this case. However, we need not reach the issue. Assuming *arguendo* that the waiver of subsection 63–30–10(1) applies and that such a duty exists, it is obvious that one or more exceptions to this waiver are controlling.

■ The Lovelands claim that they relied upon representations made by Orem City that a fence would be in place before water came into the ditch. Assuming that this representation was made to the Lovelands and that they did in fact rely upon such a representation to their detriment, subsection (f), quoted above, provides an exclusion for such misrepresentations. Moreover, subsection (c), quoted above clearly excludes injuries which arise out of the approval of subdivision plats. As previously indicated in this opinion, the activities of Orem City that most immediately led to the injury sustained by the Lovelands were those surrounding approval of the Executive Estates subdivision plat B without requiring the canal be fenced or covered. Because the Utah Governmental Immunity Act excepts such activities from

75. *Id.* at 169, 172, 478 P.2d at 497, 499.

76. *Id.* at 173, 478 P.2d at 499 (footnote omitted); *see also Ingram,* 733 P.2d at 127 (section 63–30–6 does not provide immunity to city from suit by plaintiff who fell into water vault located on parking strip); *Richards v. Leavitt,* 716 P.2d 276, 278 (Utah 1985) (per curiam) (section 63–30–8 supported conclusion that city was engaged in governmental function where it maintained trees, bushes, and a sign on a parking strip); *Bigelow v. Ingersoll,* 618 P.2d 50, 53 (Utah 1980) (trial court erred in granting summary judgment in favor of state where trial court failed to rule on whether traffic control system was defective or unreasonably dangerous under 63–30–8); *Gorgoza v. Utah State Road Comm'n,* 553 P.2d 413, 417–18 (Utah 1976) (Ellett, J., dissenting) ("This is not the kind of defect in the highway wherein the State waives immunity from suit in case damages are occasioned. The defect, if any, was on the *private land* of Gorgoza." (Footnote omitted.)); *Murray v. Ogden City,* 548 P.2d 896, 897, 898 (Utah 1976) (trial court erred in granting city summary judgment since immunity is waived for dangerous conditions on sidewalks; summary judgment in favor of private defendant was proper since it did not own or have duty to maintain sidewalk); *McKay v. Salt Lake City,* 547 P.2d 210, 211 (Utah 1976) (immunity was waived in suit to recover for injury to private property since injury was caused by defective condition of street).

77. *See Thomas,* 642 P.2d at 739–40 (Hall, C.J., concurring in the result); *see also* 13 McQuillan, *The Law of Municipal Corporations* § 37.01, at 8 (1987).

the waiver found in subsection 63–30–10(1) and because sections 63–30–8 and –9 are not applicable for the reason discussed above, the trial court did not err in granting summary judgment in favor of Orem City.

## V

For the reasons above stated, the trial court did not err in granting defendants' motions for summary judgment. Therefore, the judgments are affirmed. Costs to defendants.

HOWE and ZIMMERMAN, JJ., concur.

STEWART, Associate Chief Justice (concurring and dissenting):

I concur in the majority opinion except for sustaining the summary judgment against Brown Brothers, the developer of the subdivision in question. The issue of liability was decided by the trial court on summary judgment, and, therefore, a record has not been developed which could elucidate such critical issues as the cost of providing protection from the risks presented by the location of the canal, the peculiar risks associated with a canal of this type, the location of the subdivision or development in this case in relationship to surrounding properties and the nature of those properties, and other factors which ought to bear upon the determination of whether Brown Brothers should be held to have a duty running to purchasers of homes and whether they in fact breached such a duty. In my view, it is not appropriate for this Court to decide simply as a matter of law that under no circumstances does a developer of a subdivision have a duty to protect purchasers of a residence from injury or death caused by an artificial waterway or canal located on the premises of a subdivision. Of course, if the case were to go to trial, the parents' negligence, if any, could be at issue. *See generally* Annot., 62 A.L.R.3d 541 (1975).

I concur with the majority opinion in other respects.

DURHAM, Justice (concurring and dissenting):

I concur in the result as to the liability of Brown Brothers, but write separately in part I of this opinion about the analysis. I dissent as to the liability of North Union Irrigation Co. in part II.

## I.

Although I concur in the result as to the liability of Brown Brothers, I write separately to identify a concern about the legal relationship between an original subdivider and a subvendee. Generally speaking, the doctrine of caveat emptor still applies to sales of land with the result that, in the absence of an express agreement, the vendee and all subvendees cannot hold the vendor liable for injuries that arise out of a dangerous condition on the land. Restatement (Second) of Torts § 352 (1965). Two exceptions to this rule have developed: (1) liability extends to the vendor when he conceals a dangerous condition; and (2) a vendee may hold a builder-developer strictly liable for defects in the construction of a home. Restatement (Second) of Torts § 353 (1965); W. Prosser & W. Keaton, *The Law of Torts* 721 (5th ed. 1984).

The majority correctly states that treatment of the issue of duty requires an analysis of the legal relations between the parties. W. Prosser & W. Keaton, *The Law of Torts* 356–57 (5th ed. 1984). Under general negligence analysis, the court would resolve this issue by determining if, as a matter of law, the tort-feasor could have anticipated the harm to the plaintiff. Restatement (Second) of Torts § 281 comment c (1965). Despite this general rule, a vendor of real estate remains totally immune from liability for any injury his conduct in maintaining the land may cause to a subsequent purchaser. It would be preferable, in my view, to apply the foreseeability rule to determine duty in negligence actions by vendees against vendors. In this case, Brown Brothers could have foreseen the harm to plaintiffs; therefore, they would owe a duty to plaintiffs to act with reasonable care under a general duty analysis.

One of the reasons for retaining the doctrine of caveat emptor in the area of real estate transactions is the assumption that the vendee has a reasonable opportunity to inspect the premises; therefore, the vendor has no liability for any injury arising out of dangerous conditions on the land at the time of sale. The purpose of the doctrine apparently is to protect vendors from suits where the plaintiff presumably knew of the condition. The vendor, however, would receive the same protection under an analysis of the negligence of the parties involved. In this case, for example, a jury could easily decide that plaintiffs' negligence outweighed Brown Brothers' and thereby relieve Brown Brothers of liability. Although this would require Brown Brothers to litigate the suit, it seems a better solution to meeting the competing interests of the vendor and vendee than does permitting the vendor blanket immunity on the theory that he has no duty to the vendee.

## II.

With respect to the liability of North Union Irrigation Co., I write to clarify the condition of the canal in question here and to discuss what I perceive as an unjustifiable paradox in Utah law.

The majority opinion does not adequately describe the condition of the canal in which Michael Loveland drowned. North Union Irrigation Co. owns a canal easement running through the Lovelands' back yard about ten feet from their property line and parallel to it. The canal is made of cement and is approximately ten feet wide. The edges of the canal are overgrown with morning glory, which obscures the edges of the canal. The cement sides of the canal are covered in slippery moss.

The majority opinion discusses the attractive nuisance doctrine, under which it declares that North Union has no duty to protect children from its canals. I do not think this doctrine should be applied to a child who has drowned in his own back yard and was not therefore a trespasser, as is ordinarily the case under an attractive nuisance analysis. I think a more apt analysis is found in the duty of care owed by the owners of ditches. We have consistently held that those in control of ditches and similar waterways are bound by a standard of reasonable care and are liable for damages when their conduct falls below that standard. In *Jensen v. Davis and Weber Counties Canals Co.*, 44 Utah 10, 137 P. 635 (1913), we stated:

> [The] owners of irrigating canals or ditches are liable for injuries or damages which are directly caused by their acts of omission or commission, if such acts constitute negligence and damage follows. In other words, if by the exercise of ordinary care and prudence, as those terms are ordinarily defined in negligence cases, the damages could have been avoided, a failure to exercise such care and prudence may constitute actionable negligence.

44 Utah at 14, 137 P. at 636. *See also Jenkins v. Hooper Irrigation Co.*, 13 Utah 100, 44 P. 829 (1896) (holding defendant liable for damage to plaintiff's trees and crops which were destroyed when defendant's canal overflowed on plaintiff's land; we stated, "The true standard by which to test the charge of negligence was one of prudence and care"); *Mackay v. Breeze*, 72 Utah 305, 269 P. 1026 (1928) (applying traditional negligence concepts in a case involving liability for harm to property from escaping water); *Lisonbee v. Monroe Irrigation Co.*, 18 Utah 343, 54 P. 1009 (1898) (holding that irrigation companies have a duty to construct and maintain their canals in such a way that they do not harm the property of others). The legislature has also imposed upon the owners of ditches a duty of reasonable care. Utah Code Ann. § 73-1-8 (1980): "The owner of any ditch, canal, flume or other watercourse shall maintain the same in repair so as to prevent waste of water or damage to the property of others...."

I find it deeply ironic that our case law and statutes impose on ditch owners a duty of care which protects the property of others, while we remain unwilling to create a parallel duty to protect human life. The majority opinion justifies its conclusion with policy-based arguments tied to cost analysis. For empirical evidence, the ma-

jority relies on *Charvos v. Salt Lake City,* 42 Utah 455, 131 P. 901 (1913), a 1913 case containing a summary of evidence taken as to the condition of Salt Lake's ditches in that year. I am unpersuaded by that evidence. I think the duty of reasonable care found in our previous case law and statutes should be read to require reasonable care in protecting lives as well as property. At least, North Union Irrigation Co. should be required to prove the validity of the cost assumption it has asked the courts to rely on.

Further, I note that whatever force of logic the majority opinion might have in a case in which a trespassing child was harmed by an exposed ditch does not seem to be present in this case. The defendants own an easement through the Lovelands' back yard. It was apparent to defendants when the subdivision containing the Loveland home was constructed that children would have access to the canals. Ironically, the existence of the canal company's easement complicated the ability of the Lovelands to place a fence in their own back yard. In *North Union Canal Co. v. Newell,* 550 P.2d 178 (Utah 1976), North Union Canal Co. sued property owners who had installed a fence on their property (to protect it from North Union Canal's easement) to compel the removal of the fence, which North Union claimed interfered with its use and enjoyment of its easement by making it more difficult for it to use canal maintenance equipment. We held that considerations such as the safeguarding of children allowed the installation of the fence, but required litigation to settle the exact description and placement of gates in the fence. A legal doctrine which imposes no duty on North Union Irrigation Co. to fence or maintain its canal in a manner reasonably safe for children, while simultaneously exposing property owners who attempt to fence canals to potential litigation, is more than ironic; it is unjust.